# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 00-1497

_____

Dennis J. Pickens,          *
            *
       Appellant,     *
            *
      v.            *    Appeal from the United States
            *    District Court for the
Soo Line Railroad Company, doing     *    Southern District of Iowa.
business as C.P. Rail Systems,      *
            *
       Appellee.      *

_____

Submitted: January 8, 2001
Filed: August 30, 2001

_____

Before HANSEN and HEANEY, Circuit Judges, and WEBBER,[1] District Judge.

_____

HANSEN, Circuit Judge.

Dennis Pickens appeals the district court's[2] grant of judgment as a matter of law in favor of his former employer, Soo Line Railroad (Soo Line), after a jury found in

_____

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

his favor in this employment discrimination case. Pickens contends Soo Line terminated his employment in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213 (1994), and the Iowa Civil Rights Act (ICRA), Iowa Code §§ 216.1-216.20 (1999), after he suffered a back injury. Pickens further asserts the district court erred by submitting only the ADA claim to the jury and by excluding all evidence related to Pickens' prior Federal Employees Liability Act (FELA) trial. We affirm.

## I.

The Soo Line and its predecessors employed Pickens from 1973 until August 16, 1996, primarily as a railroad conductor. On October 14, 1992, Pickens was injured when a train's braking system malfunctioned. He sustained a herniated disc in his lower back. As a result of this injury and after an unsuccessful five-month trial work period, Pickens was unable to continue working for three years. During this extended period of not being able to work, Pickens received Railroad Retirement Board disability benefits. Pickens returned to work in October 1995, but because of medical restrictions limiting his work time to no more than an eight-hour day, he was unable to resume his duties as a conductor. Soo Line offered Pickens a switchman's position to accommodate his medical limitations. Pickens worked as a switchman for three days before concluding the job was too strenuous and refusing to continue working in the position. Because Pickens wished to return to his "road" position as a conductor, he requested that his physician lift his medical restriction to allow for a twelve-hour work day, four days per week--the schedule that the job required. Two months after returning to his duties as a full-time conductor, Pickens found that working four days per week was too strenuous, and he sought another medical restriction. Pickens' physician refused to comply with his request. Consequently,

Pickens regularly made himself unavailable for work by exercising his right to "lay off" under the railroad's collective bargaining agreement.[3]

After he chose to lay off in the spring of 1996, Soo Line required Pickens to obtain a medical status report from his physician prior to returning to work. This was the railroad's policy; however, it was the first time Soo Line had required Pickens to procure a release. One of the questions included in the release asked Pickens' physician whether he was able to return to full-time duty. Although his physician determined Pickens to be incapable of full-time employment, Pickens requested that his physician falsify his condition by answering affirmatively. His physician acquiesced to Pickens' deception of the railroad.

Pickens continued his cyclical pattern of routinely laying off, obtaining a medical release, and returning to work when he chose. While waiting for clearance to return to work after a layoff in August 1996, Pickens wrote a letter to Soo Line's claims representative with copies sent to Soo Line's president and chief medical officer, expressing his frustration. He wrote in part: "I had my medical restrictions removed to get back to work before and I will do it again if this is required. I will totally disregard safety and common sense if this is required." (District Ct. Order at 6.) Concerned both with the possibility that Pickens might act on his threat and that Pickens had misrepresented the status of his health, Soo Line held a hearing pursuant to the collective bargaining agreement and subsequently terminated him on August 16, 1996.

Litigation between the parties began when Pickens sued Soo Line alleging claims under FELA, stemming from his October 1992 back injury. In that litigation,

---

[3]The railroad allocates conductors to job assignments based upon a list of employees ranked by seniority. Under the collective bargaining agreement, each employee may withdraw his name from the list or "lay off" if he chooses to use vacation, sick leave, or personal time. (Trial Tr. at 290.)

Pickens asserted his back injury forever precluded his return to work. At a trial held in March 1996, the jury found in Pickens' favor and awarded him $50,000 in past and future pain and suffering, $65,188 in past earnings, $230,000 present value of lost future earnings, and $20,000 in disability damages. After his August 16, 1996, firing, Pickens filed the present suit, alleging that Soo Line had terminated him in violation of the ADA and the ICRA. He also asserted several contract and estoppel claims. Only the ADA issue was submitted to the jury, while the contract and estoppel claims were resolved through a contemporaneous bench trial.

Following the four-day jury trial, the jury found Soo Line's conduct violated the ADA and awarded Pickens $95,867.15 in past lost wages and benefits and $525,000 in past mental pain and suffering. At a hearing the day following the verdict, the district court reduced the past pain and suffering damages to $300,000 in order to comply with the statutory damages cap contained within the ADA. Soo Line then moved for judgment as a matter of law or alternatively for a new trial on all issues. The district court granted Soo Line's Rule 50(b) motion, finding as a matter of law that Pickens was not a person with a qualified disability and that at the time Soo Line fired him, he was neither willing nor able to perform the essential functions of his job, with or without accommodation. The district court further concluded that the estoppel claims failed because Pickens did not prove that Soo Line changed its position between the two trials to his detriment. Pickens now appeals.

II.

We review the district court's grant of judgment as a matter of law de novo. See Otting v. J.C. Penney Co., 223 F.3d 704, 711 (8th Cir. 2000). "[A] court should render judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2109 (2000) (internal quotations omitted). In making our determination, we, like the

4

district court, will view all the facts in the light most favorable to the nonmoving party and must refuse to make credibility determinations or weigh the evidence. Id. at 2110; Phillips v. Union Pac. R.R., 216 F.3d 703, 706 (8th Cir. 2000).

When there is no direct evidence of discrimination, discrimination claims are analyzed under the burden-shifting method of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Thus, Pickens has the initial burden of establishing a prima facie case of discrimination; if Soo Line offers a legitimate, nondiscriminatory explanation for Pickens' discharge, then he must show that the explanation is merely a pretext for discriminatory animus. See id. at 803-04; see also Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 931-32 (8th Cir. 2000) (applying burden-shifting analysis set forth in McDonnell Douglas and reversing the district court's denial of a motion for judgment as a matter of law). Because this case was fully tried on the merits, "[w]e need not review the adequacy of the evidence at each stage of the McDonnell Douglas analysis; rather, our review concentrates on whether the record supports the ultimate finding of discrimination." Cardenas v. AT & T, Corp., Nos. 00-1915, 00-2353, 2001 WL 322156 (8th Cir. Apr. 4, 2001) (internal quotations omitted).

In order to make out a case of discriminatory discharge under the ADA, Pickens must prove that (1) he is disabled within the meaning of the statute; (2) he is a qualified individual; and (3) that he was terminated because of his disability. See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir.), cert. denied, 528 U.S. 818 (1999). A qualified individual is one who is able to perform, with or without accommodation, "the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Pickens asserts that he is qualified to perform the essential functions of his job regardless of his excessive absences given the nature of the railroad's scheduling structure. Pickens contends that because the railroad allows an employee to "lay off" of working any day of his choosing, this procedure makes his use of the practice a nonissue. We disagree. This

court has consistently held that "'regular and reliable attendance is a necessary element of most jobs.'" Greer v. Emerson Elec. Co., 185 F.3d 917, 921 (8th Cir. 1999) (quoting Nesser v. Trans World Airlines, Inc., 160 F.3d 442, 445 (8th Cir. 1998)); see Moore v. Payless Shoe Source, Inc., 187 F.3d 845, 848 (8th Cir.), cert. denied, 528 U.S. 1050 (1999). Even though the railroad's system of scheduling appears quite flexible, the railroad's policy requires regular, reliable attendance, and Pickens' conductor's job was full-time. Pickens' choice to lay off twenty-nine times from October 1995 to August 1996 is excessive and eviscerates any regularity in his attendance. "An employee who is unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones." Moore, 187 F.3d at 848 (internal quotations omitted) (alteration in original).

Pickens' case is similar to Buckles v. First Data Res., Inc., 176 F.3d 1098 (8th Cir. 1999). In Buckles, a panel of this court reversed the district court's denial of judgment as a matter of law and remanded for entry of judgment in favor of the employer when an employee with acute sinusitis was chronically absent from his job. Id. at 1102. The employee contended that he was qualified to perform his duties with the accommodation of leaving work any time an air-borne irritant aggravated his condition. Id. at 1101. Our court disagreed, reasoning that "[u]nfettered ability to leave work at any time is certainly not a reasonable accommodation," and an employer is not required by the ADA to provide an unlimited absentee policy. Id. The ADA does cite a part-time or modified work schedule as a reasonable means of accommodation, see 42 U.S.C. § 12111(9)(B), but we view Pickens' suggested method--that he should be able to work only when he feels like working--as unreasonable as a matter of law. Soo Line accommodated Pickens by assigning him to do the switchman's job where he could work within his medical restrictions for two days per week but be paid for a full five-day work week. This effort proved unsuccessful when Pickens refused to perform as a switchman after only three days on duty. Additionally, he had his physician falsify that he was able to perform full-time work because he did not want to be limited to the part-time list of conductors.

6

Furthermore, as the district court noted, when Pickens applied for disability benefits from the Railroad Retirement Board after Soo Line terminated him, he asserted under penalty of perjury that, as of August 1996, he was completely unable to work in the railroad industry because of his disability. Although Supreme Court precedent mandates that Pickens' admission of a total inability to work is not wholly inconsistent with inclusion under the ADA, this is true only if a reasonable juror could conclude he could perform the essential elements of his job with or without a reasonable accommodation. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 807 (1999). Our review of the record convinces us that as a matter of law, no reasonable juror could find Pickens to be a qualified individual because he was unable to perform the essential duties of his job with or without a reasonable accommodation.

Moreover, even assuming Pickens established that he was qualified, Soo Line offered a nondiscriminatory reason for Pickens' termination. See Reeves, 120 S. Ct. at 2109 ("[A]n employer [is] entitled to judgment as a matter of law if the record conclusively reveal[s] some other, nondiscriminatory reason for the employment decision . . . ."). It is uncontested that Pickens admitted to sending a letter threatening to have his medical restrictions removed, as he had done before, and disregard "safety and common sense if this [was] required" in order to return to work with a more favorable work schedule. (Trial Tr. at 220.) Soo Line maintains that it terminated Pickens both as a result of this letter and for falsifying his medical status. Pickens argues that this letter is "not at all threatening" and is tempered by the use of the phrase "if required." (Appellant's Br. at 32-33.) Taking into account Pickens' position as a conductor, which brings with it the responsibility of moving trains and the possibility of catastrophic injury, certainly an express threat to disregard the safety of others in order to be employable is a legitimate, nondiscriminatory reason for discharging an employee. See, e.g., Clark v. Runyon, 218 F.3d 915, 919 (8th Cir. 2000) (finding actual violence and threats of violence nonpretextual reasons for terminating an employee); Phillips, 216 F.3d at 706 (threatening a coworker with

bodily harm was nondiscriminatory reason for suspension); Williams v. Widnall, 79 F.3d 1003, 1007 (10th Cir. 1996) (concluding employee was terminated not because of disability, but because he "made threats against his supervisor and co-workers"). Furthermore, a careful review of the record supports the district court's conclusion that the reasons provided by the railroad for his termination were nonpretextual.

We conclude that Pickens failed to set forth sufficient evidence for a jury to reasonably find that he was able to perform his railroad duties with or without accommodation. Moreover, Soo Line presented conclusive, legally ample, and nonpretextual reasons for terminating Pickens wholly unrelated to his impairment. The district court's entry of judgment as a matter of law was correct.

Pickens also asserts that the district court's refusal to submit only the ADA claim to the jury warrants reversal. The district court excluded the ICRA claim stating Pickens' success or failure "stands on the federal disability claim." (Trial Tr. at 338.) Soo Line's contention that the Iowa courts do not allow jury trials of ICRA claims is correct. Smith v. ADM Feed Corp., 456 N.W.2d 378, 380 (Iowa 1990) (en banc). "However, the right to a jury trial in federal court is a question of federal law, even when the federal court is enforcing state-created rights and obligations . . . even when a state statute or state constitution would preclude jury trial in state court." Gipson v. KAS Snacktime Co., 83 F.3d 225, 230 (8th Cir. 1996). We disagree with the district court's failure to submit the ICRA claim to the jury, but because we find judgment as a matter of law was appropriate as to the ADA claim, this error is harmless. See, e.g., Berg v. Norand Corp., 169 F.3d 1140, 1144 & n.5 (8th Cir. 1999) (resolving ADA claim simultaneously disposes of state-law discrimination claim); Vincent v. Four M Paper Corp., 589 N.W.2d 55, 59-60 (Iowa 1999) (recognizing similarities between the ADA and ICRA and noting the incorporation of federal definitions into the Iowa statute).

8

Pickens next contends that the district court erred by rejecting his judicial estoppel claim. He argues that Soo Line's attorney at the FELA trial made statements during his closing argument conveying Soo Line's willingness to accommodate him, and therefore, Soo Line is judicially estopped from denying these statements at the subsequent trial. "[J]udicial estoppel prohibits a party from taking inconsistent positions in the same or related litigation"; the purpose of which "is to protect the integrity of the judicial process." Hossaini v. W. Mo. Med. Ctr., 140 F.3d 1140, 1142-43 (8th Cir. 1998) (internal quotations omitted).

During the FELA trial, Pickens claimed he was totally disabled because of his back injury. Soo Line addressed Pickens' contention by stating it could accommodate him with an alternative work assignment and schedule because his injuries were in fact less serious than he contended. In comparison, at the later ADA trial, Soo Line argued that regular attendance at work is an essential function of Pickens' full-time conductor position and that repeated laying off for an old injury was not a viable accommodation when his physician had certified him fit to perform full-time work as a conductor. In the first instance, Soo Line believed it could accommodate Pickens, and it tried to do so by offering him the switchman position. However, subsequent to the FELA trial, it became evident that the only accommodation Pickens was willing to accept was an unreasonable, self-created and self-dictated, work schedule. Because Soo Line's positions are not inherently inconsistent, judicial estoppel is inapplicable.

Finally, Pickens challenges the district court's refusal to allow evidence referencing the prior FELA trial. The court reviews the district court's evidentiary rulings for an abuse of discretion. Allen v. Entergy Corp., 193 F.3d 1010, 1015 (8th Cir. 1999). We cannot agree that Pickens was prejudiced by withholding this evidence because the jury found in his favor without its admission. The district court did allow Pickens to use some of the evidence from the prior trial for impeachment

9

purposes, but it significantly limited the scope of this evidence. The district court's limitation was not an abuse of discretion.

## III.

Consequently, the judgment of the district court is affirmed.

HEANEY, Circuit Judge, dissenting.

After a careful review of the record, I am convinced that this case was properly submitted to the jury. The record reveals that many of the facts as recited by the majority were contested at trial and, indeed, remain disputed on appeal. Given these differing versions of the facts, as set out below, I do not believe that the district court should have substituted its judgment in place of the jury's. I therefore respectfully dissent.

In evaluating the district court's decision on a judgment notwithstanding the verdict, we must:

> 1) consider the evidence in the light most favorable to [Pickens], who prevailed with the jury; 2) assume that all conflicts in the evidence were resolved by the jury in [Pickens'] favor; 3) assume as proved all facts which [Pickens'] evidence tends to prove; 4) give [Pickens] the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and 5) affirm the denial of the motion if reasonable persons could differ as to the conclusions to be drawn from it.

Morgan v. Arkansas Gazette, 897 F.2d 945, 948 (8th Cir. 1990)(internal quotation omitted). The majority, however, recites a version of the facts closely mirroring those set forth in Soo Line's brief, rather than those facts that tend to prove Pickens' case.

10

If considered in the light most favorable to Pickens, the record reveals the following facts. Pickens had worked as a railroad conductor for the Soo Line for over 20 years. During that period he never had any safety or disciplinary problems. In 1992, when a train's brakes malfunctioned, Pickens sustained a back injury.

After the injury, Pickens was off work for three years. In October 1995, Soo Line brought Pickens back as a switchman, ostensibly because that position would be compatible with his medical restrictions limiting his lifting and working hours. The switchman position, however, required heavy lifting, which caused Pickens pain and would have exacerbated his disability. Pickens talked with his doctor regarding a return to the conductor position, which was less physically strenuous than the switchman position. Shortly thereafter, his doctor approved the change to the conductor position, contingent upon Pickens' ability to tolerate back pain.

Pickens then returned to work as a conductor, and he maintained a fairly consistent work schedule of two to three days a week. When his back flared up, he would "lay off" from the board, which meant that he was not available for call that day. Conductors at the Soo Line do not typically work a regular schedule. Rather, the "board" system is similar to the staffing at a temporary agency. Even if a conductor is available for service and is marked up on the board, there may not be a train available to run, in which event the conductor would be paid only a reduced rate. If the employee decided to "lay off" by taking his or her name off the board, the employee would not be called that day. A "lay off" could be charged as a sick day, personal leave day, or could be taken as time without pay. Indeed, evidence at trial established that Pickens had averaged only between three and four days of work per week before his injury had occurred. Soo Line did not submit any evidence that Pickens' flexible schedule after his injury created any expense or inconvenience to the company, given the way in which the board system worked.

Pickens maintained this flexible schedule without incident for a number of months. In March 1996, a trial was held on Pickens' FELA claim stemming from his back injury. Soo Line's attorney argued to the jury that the damages for the injury should be reduced because:

> [The b]ottom line is Mr. Pickens is still our employee. He's working. When this case is over, he'll still be working, he'll still be our employee. If he wants to work five days a week, he's got our okay to work five days a week. If he wants to work two days a week, he's got our okay to work two days a week.

(Appellant's Add.). Undoubtedly, this promise of accommodation had an influence on the jury at the FELA trial. Believing that the railroad would work with Pickens to keep him on the job, on a part-time basis if required, the jury would have been influenced to award Pickens less money than if they had known that he would not be granted any accommodations, and, indeed, be fired from his position.

Following the FELA trial, the railroad stopped accommodating his injury. When his back flared up on May 27 and Pickens called in to "lay off," Soo Line suspended him for fourteen days and required Pickens to obtain a health status report from his doctor. Further, at this point, his supervisor harassed Pickens by telling him that "[i]f [he] couldn't work any more than two to three days a week that [he] shouldn't have been allowed to return to work and that [he] should quit." (Tr. Vol. I at 99). After Pickens' back flared up, and he called in to "lay off" on August 16, 1996, Soo Line again demanded medical documentation of his condition. For weeks afterward Soo Line did not notify Pickens whether he had been approved to return to duty.

Frustrated at not hearing anything from Soo Line regarding his work status, Pickens wrote the letter of September 6, 1996. The majority places a great deal of emphasis on a portion of the letter, stating that the letter appeared threatening and

was, therefore, a non-discriminatory reason for Pickens' termination. When considered in its entirety, however, the letter is susceptible to differing interpretations. Pickens was expressing anger and frustration, but opinions could certainly differ as to whether the contents of the letter constituted a threat. Pickens began the letter by inquiring about his status, stating that his understanding from the FELA trial was that he could work part-time, as necessitated by his back injury. He documented the harassment by his supervisor and expressed his confusion as to why he was being prevented from working. The last part of a letter, where he mentions the disregard of safety "if required" (Appellant's Add.) also could have a meaning other than the one given to it by the majority. Pickens explained at the trial that he meant that by requiring him to work when his back hurt, the Soo Line could be putting his safety at risk. This interpretation fits with the protests present throughout the rest of the letter. In any event, the letter was introduced into evidence at trial, and the jury was free to draw its own conclusions about its meaning.

There was also evidence that the reasons Soo Line provided for terminating Pickens were pretextual. The first reason Soo Line gave for the termination of Pickens was the letter, which has already been discussed, ante. The second reason Soo Line gave was that Pickens had been laying off under false pretenses. At trial there was no evidence that Pickens had ever falsified an injury or that he had been malingering in any way. Rather, the Soo Line superintendent who investigated the situation based his findings on the lack of any record in Pickens' file documenting an injury (despite the Soo Line's payment of damages to Pickens for his back injury in the FELA trial).

The facts as I have set them out provide sufficient evidence for the jury to find that Soo Line discriminated against Pickens because of his disability. The jury could have found that Pickens was qualified to perform the essential functions of the job with the accommodations Soo Line had provided prior to the FELA trial. Given the "board" and the "layoff" system, the jury could have concluded that a flexible

13

schedule was a reasonable accommodation, especially because Soo Line never introduced any evidence that such a schedule would be a financial hardship. As reasonable people could disagree with the facts and whether discrimination had taken place, the case was properly submitted to the jury.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.