**NOT RECOMMENDED FOR PUBLICATION**
File Name: 15a0333n.06

**No. 14-5486**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 06, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LASHAUNNA BANKS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BOSCH REXROTH CORPORATION; DAN | ) | EASTERN DISTRICT OF KENTUCKY |
| REYNOLDS; GEOFF O'NAN; VALENDA | ) | |
| ALLEN, | ) | OPINION |
| | ) | |
| Defendants-Appellees. | ) | |

**BEFORE: DAUGHTREY, McKEAGUE, and STRANCH, Circuit Judges**

JANE B. STRANCH, Circuit Judge. Plaintiff LaShaunna Banks brings this employment discrimination case against her former employer, Bosch Rexroth Corporation, and several of its employees: Assistant Human Resources Manager Valenda Allen, Human Resources Manager Dan Reynolds, and Banks's direct supervisor, Production Manager Geoff O'Nan (collectively, Bosch). The district court dismissed several of Banks's claims on the pleadings and awarded summary judgment to Bosch on the remaining claims. Banks appeals the district court's summary judgment rulings on four of her claims: interference with her rights under the Family and Medical Leave Act (FMLA), FMLA retaliation, disability discrimination in violation of the Kentucky Civil Rights Act (KCRA), and retaliation in violation of the KCRA. We AFFIRM the district court's grant of summary judgment on all four claims.

## I. BACKGROUND

Banks was employed as an assembler at Bosch from 2004 until she was terminated in mid-2012. Bosch acknowledges that there were no issues with her on-the-job performance, and asserts that her termination was strictly attendance-related. While working at Bosch, Banks suffered from migraine headaches and reported her condition to management. On May 29, 2012, Allen approved Banks's request for intermittent FMLA leave due to her migraines. Before then, Banks had already taken a substantial amount of FMLA leave for various conditions. Banks's form requesting medical leave was signed by her treating physician, Dr. Larry Burns, and indicated that her migraines were a permanent and chronic condition requiring bed rest, a dark room, and prescription medication.

On May 31, Banks gave Bosch a letter from Dr. Burns listing workplace "reasonable accommodations" he recommended. These included giving Banks the ability to leave the worksite if she experienced a migraine at work and her medication did not resolve the matter within a half an hour, and avoiding her exposure to two chemicals used at the worksite, AccroLube and toluene.

On June 3, Banks filed an EEOC complaint alleging that Bosch was discriminating against her on the basis of her disability by failing to accommodate her request to be removed from areas where "two chemicals" (presumably AccroLube and toluene) were present when she was having a migraine episode, forcing her to get a doctor's statement about her condition, and then mocking her doctor's statement and requesting another doctor's statement.

Banks filed a union grievance on June 14, alleging that she had received a verbal attendance warning as a result of her FMLA time having been improperly coded. The company's written reply stated that Banks had been granted "too much time under the FMLA

guidelines" and that "the company would like to sit down with grievant and discuss in detail" the situation with her FMLA time. Bosch also included a sheet outlining Banks's use of FMLA time in detail. Banks then dropped the grievance, saying the process had put her through "emotional duress" and that it was "no longer worth it" to pursue the matter. R. 49-11, PageID 827.

On or before June 19, Banks knew that Bosch's records indicated she had exhausted her FMLA leave in addition to her vacation time. The time Bosch had granted to Banks as FMLA leave that was in excess of her permitted 480 hours per year—141 hours by Bosch's count—was recoded as excused medical leave and did not count against Banks in Bosch's attendance calculations. When asked at her deposition whether there was ever an absence she thought should have been covered by the FMLA but was not, Banks agreed that there was not. Banks acknowledged that by the end of May 2012 she had used all of her vacation time and that Bosch claimed she had also exceeded the permitted number of unexcused absences, though she had disputed the latter point through the company grievance process.

Banks filed another union grievance on June 20, alleging that Bosch failed to acknowledge her disability and provide reasonable accommodations to her. Bosch responded that it felt it had "both recognized and accommodated" Banks's condition, but the union disagreed and appealed it to the next step: review by the HR manager. The HR manager's reply is not noted on the grievance form. Banks filed additional grievances on July 6, which alleged that she had not been provided with reasonable accommodations and that the company had taken improper disciplinary actions against her.

On July 9, Banks took FMLA leave, and states that she followed Bosch's call-in procedure for reporting an FMLA absence. Bosch stated that Banks never called, but at the summary judgment stage we accept Banks's assertion and assume she did. When Banks arrived

late at work the following day, her supervisor summoned her to Human Resources for a meeting. Banks testified that Allen told her she was terminated at the meeting, but Allen testified that she told Banks she was suspended, not that she was terminated.

Bosch clarified the situation the next day: Reynolds sent Banks a follow-up letter explaining that though her lateness and absence put her at the termination level, the company wished to send her to a doctor for a second opinion about her medical condition, that it would consider whether or not to terminate her in light of the doctor's conclusions, and that she would remain on paid suspension until a final determination could be made. He then sent Banks several additional letters reiterating this information and attempting to schedule medical examinations for her. On August 7, after Banks had failed to appear at two separate scheduled medical appointments, Reynolds sent Banks a letter saying she had been terminated. Banks continues to insist that she had been fired on July 10, and said Reynolds's letters to the contrary did nothing to change her opinion.

In her EEOC complaint, Banks asserted that Bosch "has tormented me for many years due to my disability." When asked at her deposition what Bosch did to torment her, she said, "They constantly singled me out and yelled and me and made fun of my disability." When prompted to give a specific example of such behavior, she said the incidents were "too numerous for me to tell you off the top of my head at this moment." Pressed to give just one example, she said that when she told O'Nan about a migraine one time, he started yelling at her that the next time she said she was fighting a migraine she would be made to go up front, clock out, go to the doctor, and get a note that specifically says she gets migraines. When asked if there were other incidents, she said, "That's all I can recall at this moment."

## II.  ANALYSIS

We review de novo a district court's order granting summary judgment.  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).  Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'"  *Laster*, 746 F.3d at 726 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  In reviewing such a grant, we view all evidence and draw all inferences in the light most favorable to the nonmoving party. *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (en banc); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The question is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### A.  FMLA interference claim

"The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.,* 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)).  "It is unlawful 'for an employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the FMLA].'" *Id.* (quoting 29 U.S.C. § 2615(a)(1)). An employer's violation of § 2615 renders it liable to an affected employee for damages and appropriate equitable relief. *Id.* (citing 29 U.S.C. § 2617(a)(1)).

The FMLA enables qualifying employees to take their 12 weeks of leave per year in a single block, as intermittent leave taken in separate periods due to a single illness or injury, or

through a reduced work schedule, usually to part-time. *See Hoffman v. Prof. Med. Team,* 394 F.3d 414, 418 (6th Cir. 2005). The regulations accompanying the FMLA give employers several options for determining the 12-month period in which an employee's 12 weeks of leave entitlement occurs. 29 C.F.R. § 825.200(b). Here Bosch employed one permitted option, a "'rolling' 12-month period measured backward from the date an employee uses any FMLA leave." *See id.*

"This court recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Killian v. Yorozu Auto. Tenn., Inc.,* 454 F.3d 549, 555-56 (6th Cir. 2006) (quoting *Hoge v. Honda of America Mfg., Inc.,* 384 F.3d 238, 244 (6th Cir. 2004)). In the instant case, Ms. Banks alleges both theories, and the district court granted summary judgment to Bosch with regard to both. We address the entitlement claim here and the retaliation claim below in Section II.D.

The entitlement theory requires a plaintiff to demonstrate that (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled. *Killian,* 454 F.3d at 556. Here, only the last element is at issue—whether Bosch's termination of Banks's employment denied her statutory benefits to which she was entitled.

"This inquiry is an objective one divorced from the employer's motives, with the central question being simply whether the employee was entitled to the FMLA benefits at issue." *Edgar v. JAC Products, Inc.,* 443 F.3d 501, 511 (6th Cir. 2006). Furthermore, "the FMLA is not a

strict-liability statute." *Id.* at 507. "Employees seeking relief under the entitlement theory must therefore establish that the employer's violation caused them harm." *Id.* at 508.

Here, Banks's expert reviewed Bosch's human resources documents accounting for Banks's leave, and concluded that over the year leading up to Banks's termination, 293 hours of leave Bosch had designated as FMLA leave were properly documented, and that Banks therefore had 187 hours left in her FMLA allotment. Bosch's spreadsheet of Banks's leave time, however, indicates that from May 23, 2011 through May 29, 2012, Banks had exceeded her allotted 480 annual hours of leave time by 141 hours. Because Bosch opted to use the rolling 12-month period, any hours tallied before May 29, 2011 (one year before the end of the tally at May 29, 2012) should be removed. This, however, includes only five hours on May 23, 2011. At her deposition, Banks was asked whether some of the hours had been miscoded. She pointed to a half day she took on February 3, 2012 that she alleged was improperly coded as FMLA leave. The record provides no other instances where Banks asserts that she did not actually take the leave that was included on Bosch's spreadsheet.[1] Banks's expert asserts only that many hours of Banks's leave were not properly coded as FMLA, not that the leave was never taken. With the exception of her claim that part of one day was incorrectly coded as FMLA leave, Banks has not provided any evidence that would enable a reasonable trier of fact to conclude that she did not in fact use all of the leave Bosch cataloged and designated as FMLA leave on the spreadsheet it provided to Banks.

Assuming that Banks's expert is correct that Bosch did not meet all of the regulatory requirements when cataloging her FMLA leave, the pertinent question is how that leave should be counted. The expert opines that it "makes no difference that Ms. Banks was in fact absent for

---

[1]In her deposition, Banks noted that at one point she had copies of her FMLA paperwork and had made timelines of her migraine history, but none of this information was included in the record.

many more hours than" the 293 hours of properly-documented FMLA leave and that "[s]he is entitled to timely written notice of each designation decision under the regulations, and she did not receive it in several cases." R. 51-35, PageID 1014. But this conclusion is at odds with the Supreme Court's decision in *Ragsdale v. Wolverine World Wide, Inc.*, which held that a plaintiff asserting an FMLA claim must demonstrate prejudice as a result of the defendant's improper actions. 535 U.S. 81, 89 (2002). We have summarized *Ragsdale*'s holding as follows:

> In *Ragsdale* the Supreme Court struck down a regulation, 29 C.F.R. § 825.700(a) (2001), under which an employer that failed to designate an employee's leave as FMLA-qualifying was prohibited from counting the leave against the employee's FMLA entitlement. See 535 U.S. at 89-96, 122 S.Ct. 1155. The regulation was invalid, the Court explained, "because it alter[ed] the FMLA's cause of action in a fundamental way: It relieve[d] employees of the burden of proving any real impairment of their rights and resulting prejudice." *Id.* at 90, 122 S.Ct. 1155. By not requiring a showing of prejudice, the regulation allowed an employee to sue under the FMLA without having been denied the Act's substantive entitlements. See *id.* at 90-91, 122 S.Ct. 1155.

*Wilkerson v. Autozone, Inc.*, 152 F. App'x 444, 449 (6th Cir. 2005). The central question here, then, is whether Banks received the substantive benefits to which she was entitled under the FMLA even in light of Bosch's alleged technical violations of the act.

In *Ragsdale*, as in the instant case, the plaintiff had actually been given more leave than was mandated under the FMLA. The *Ragsdale* plaintiff was granted 30 weeks of medical leave under her employer's plan, then argued that once those were exhausted she was entitled to 12 additional weeks of FMLA leave because the employer had not indicated that 12 of the 30 weeks of medical leave would be counted as FMLA leave. 535 U.S. at 84. The Supreme Court found that giving the employee another 12 weeks of leave on top of the 30, as required under the regulation, would violate the FMLA's provisions that "[t]he employer is liable only for compensation and benefits lost 'by reason of the violation,' 42 U.S.C. § 2617(a)(1)(A)(i)(I), for other monetary losses sustained 'as a direct result of the violation,' § 2617(a)(1)(A)(i)(II), and

for 'appropriate' equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B)." *Ragsdale*, 535 U.S. at 89. Under the FMLA, "[t]he remedy is tailored to the harm suffered," *id.*, yet under the regulation, Ragsdale would be entitled to reinstatement and backpay, "even though reinstatement could not be said to be 'appropriate' in these circumstances and Ragsdale lost no compensation 'by reason of' Wolverine's failure to designate her absence as FMLA leave." *Id.* at 91. Those principles dictate the result here.

Because Banks received her full allotment of FMLA hours (and then some), we must examine the record, under the summary judgment standard, to determine if she could show the prejudice required to recover under the FMLA. Caselaw and the applicable regulations reveal several scenarios in which an employee could show prejudice even after having exhausted her FMLA-allotted leave hours, but none of them fits the facts of this case. In *Wilkerson*, we found that an employee who had exhausted her FMLA leave hours met her burden of showing prejudice under the FMLA when her employer told her that she could take six weeks of FMLA leave after giving birth, inhibited her efforts to return to work early, and then fired her based in part on its later calculation that her FMLA leave had been exhausted before the six weeks was up. *Wilkerson*, 152 F. App'x at 449-50. The regulations governing implementation of the FMLA also indicate that it is easier to show prejudice after exhaustion of leave when the leave was taken to care for another person rather than oneself. *See* 29 C.F.R. § 825.301(e). If the employee uses the leave herself, we presume she needed to do so and it is less likely that she would not have taken the leave had the employer designated it properly. *Id.* If the employee used the leave to care for another, however, it is reasonable to argue that had the leave been correctly designated, she would have found someone else to care for that sick person so she could save her leave for future use. *Id.* *Ragsdale* itself contemplates a third possible scenario,

one in which an employee takes all 12 weeks of leave at once because she was never made aware

that it can be taken intermittently and thinks she has no other option. 535 U.S. at 89-90.

Here, the record does not indicate any prejudice under these or any other plausible

scenario: Banks was given all of the leave required under the FMLA plus over 100 additional

hours, she has not shown detrimental reliance on Bosch's representations of how much leave she

had remaining,[2] and she took the leave intermittently and for her own condition. Acceptance of

Banks's argument that 186 hours of her leave were not properly coded as FMLA leave results in

two possible scenarios: either the leave was FMLA leave and Banks exhausted her allotment, or

the leave was unexcused, and Bosch was entitled to terminate Banks for taking it. Had the leave

not been coded as FMLA leave, Bosch would have had a legitimate basis to terminate Banks far

earlier than July 2012. For these reasons, we affirm the district court's decision to grant Bosch's

motion for summary judgment on Banks's FMLA interference claim.

## B. KCRA discrimination and failure to accommodate claim

The district court granted summary judgment to Bosch on Banks's KCRA discrimination

and failure to accommodate claims upon finding that Banks had failed to offer sufficient

evidence for a reasonable trier of fact to conclude that she was a qualified individual under the

ADA. Though Banks brought her claim under the KCRA's disability protections rather than the

federal ADA, the KCRA's language parallels that of the ADA and Kentucky courts interpret the

---

[2]In her deposition Allen admits that she improperly calculated Banks's leave at one point and told Banks that she had 64.3 hours of leave remaining on March 28, 2012, when in fact she had none. No jury could find this error to be prejudicial based on the evidence in the record because Bosh's calculations show that Banks took well over 64.3 hours of leave in the days and weeks following that and was not penalized. She therefore could have relied—and apparently actually did rely—on Bosch's calculation error in her favor without any penalty. Bosch also asked Banks to discuss discrepancies between her own records and the company's records with regard to her FMLA leave, but Banks refused to do so, saying that "it wasn't proper protocol."

KCRA consistently with the federal statute. *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003); *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007).

Under the ADA, it is unlawful for an employer to discriminate against a "qualified individual on the basis of a disability." 42 U.S.C. § 12112(a). "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). Thus we will consider these claims together through the "reasonable accommodation" analysis. The Act provides that:

> The term "reasonable accommodation" may include:
>
> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8).

Banks's discrimination claim is based upon Bosch's alleged failure to adopt the "reasonable accommodations" for her disability—her chronic migraine headaches—that Dr. Burns proposed in his letter to Bosch. Bosch asserts that Dr. Burns's proposed accommodations were unreasonable, and that because Banks has not demonstrated that she could perform the essential functions of her employment with a reasonable accommodation, she was not a qualified individual under the ADA or KCRA.

As noted above, failure to make a reasonable accommodation to a qualified individual falls within the ADA definition of discrimination. "Accordingly, claims premised upon an

employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). "This conclusion is consistent with the definition of direct evidence, for if the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination." *Id.*

When an ADA plaintiff's claim is based on direct evidence, this court forgoes the familiar *McDonnell Douglas* burden-shifting framework used in indirect evidence cases, and instead employs the following analytical framework:

> 1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Kleiber*, 485 F.3d at 869 (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004). We analyze Banks's claim under this framework.

1. Banks's proposed accommodations

Dr. Burns's letter sets out proposed reasonable accommodations based on Banks's condition:

> Ms. LaShaunna Banks has been my patient for many years. She has a medical condition that may begin suddenly at work so she will require immediate treatment with medications. She may need 15-30 minutes of rest during the work day in order for her to take her medications and allow time for medication to be effective. If the medications do not resolve the condition promptly, then she may be required to leave the work site. Also, if she is required to take other sedating medications prior to work, the she may be unable to work that day; however if the medication side effects resolve, she may be able to return to work, but at a later hour during the day.

Unfortunately, her condition is exacerbated by various smells and chemicals. She should avoid exposure to accrolube and toluene. She should be allowed to separate herself from employees that overuse perfumes, cologne, and scented lotions. When she actually has an episode of her condition, she should have limited exposure to other strong chemicals and smells. To assist her in avoiding these chemicals and smells, please allow Ms. Banks to use her fan at the work site for ventilation of her area. Finally, please limit her exposure to the paint booth for only one hour. If needed, she could return back to the paint area after she has been in a nonchemical location for at least two hours.

R. 33-3, PageID 484.

At the summary judgment stage, the district court focused on two of the proposed accommodations in Dr. Burns's letter, and ruled (1) that the proposed accommodation that Banks might be "required to leave the worksite" when her medications do not resolve her migraines "promptly" (within 15-30 minutes) fails as a matter of law, and (2) that Banks had failed to meet her burden of production concerning the accommodation that "[s]he should avoid exposure to accrolube and toluene." R. 70, PageID 1384-85. Toluene is confined mainly to Bosch's paint room, but AccroLube is used throughout Bosch's manufacturing process, and is present in most areas of the plant.

Banks bears the initial burden of proposing an accommodation and showing that a given accommodation is "objectively reasonable." *See Kleiber*, 485 F.3d at 870. She concedes that being present at work was an essential function of her job. Because Dr. Burns's proposed accommodation gave Banks the ability to leave work at her own discretion on 15 to 30 minutes' notice any time she felt her medicine was not being effective, the district court reasoned that the accommodation was not objectively reasonable as required under the law. The district court's conclusion on this point is in accord with our holding that "[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a qualified individual protected by the ADA." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998). Other

courts have similarly noted that an unlimited ability to leave work is not reasonable. *See, e.g.,*

*Pickens v. Soo Line R.R. Co.*, 264 F.3d 773,778 (8th Cir. 2001).

On appeal Banks argues that this accommodation was a request for intermittent FMLA leave rather than a request for an unfettered right to leave work at any time. The FMLA contemplates the need for unforeseen emergency leave, and we have found that "[W]hen the approximate time of the needed leave is unforeseeable, the eligible employee should give the employer notice of the need for the leave 'as soon as practicable under the facts and circumstances of the particular case.'" *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004) (quoting 29 C.F.R. § 825.303(a)). We have also held, however, that "inability to satisfy basic attendance requirements" and "excessive absenteeism" are bases for finding that a particular disabled individual is not a qualified individual with respect to the ADA's framework. *Id.* at 418-19. Dr. Burns's proposed accommodation contains no objective standard of evaluation or limitations on Ms. Banks's ability to leave work if she experiences a migraine. While there may be circumstances in which an accommodation permitting an employee to exercise discretion regarding her work hours would be reasonable, the record here does not support such a determination.

Reynolds, Bosch's Human Resources Manager, explained that the accommodation was unreasonable and would impose an "undue hardship" on Bosch because it would give Banks "the ability to basically come and go as she pleased," and that this was disruptive and unduly hard on Bosch because:

> [W]e have production lines. You have people scheduled. We have orders that
> need to be completed, and if you don't know what your manning's going to be
> because the person takes some medication and then has to leave, you know,
> you're not going to get that production out that day. And it's not like we have
> people to move around . . . If it happened, you know now and then, that's one

thing, but with the frequency that it happened, it's pretty hard to accommodate that.

R. 49-8, PageID 815-16. Reynolds indicated that in 2011 and 2012, Banks was having migraines at work at least weekly, and at times daily. Here, where the parties agree that regular attendance was an essential function of Banks's job, the district court committed no error by holding that an accommodation giving Banks an unfettered right to leave would be unreasonable as a matter of law, particularly since she had already exhausted her FMLA leave. Because the district court correctly found that a necessary component of Banks's requested accommodation—the ability to leave work as specified—was unreasonable, we need not consider the district court's rejection of the additional requested accommodation regarding AccroLube and toluene exposure.

2.  Breakdown of the interactive process

On appeal, Banks also asserts that there was a genuine issue of material fact about whether Bosch engaged in the required interactive process between employer and employee that is used to identify reasonable accommodations. The KCRA looks to the ADA's regulations, which provide that "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). This process is used to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id*. Though the interactive process is not described in the text of the ADA itself, it is mandatory, and both parties are obligated to participate in good faith. *Kleiber*, 485 F.3d at 871 (citing authority from multiple circuits). Should a party obstruct the process or otherwise fail to participate in good faith, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Id*.

Here, Banks initiated the interactive process by informing Bosch of her disability and providing Dr. Burns's letter. Though Bosch attempted to schedule two Independent Medical Examinations (IMEs) for Banks in response to Banks's initiation of the process, Banks argues that this was not a good faith continuation of the process for two reasons: First, because Banks had actually been terminated on July 10, before she was notified of the scheduled IMEs, and second, because though the ADA allows employers to schedule IMEs for employees out of "business necessity," no comparable right exists under the KCRA. Neither argument succeeds.

*a. The date of Banks's termination*

Banks alleges she was terminated on July 10, after being summoned to Human Resources for a meeting. Banks, union steward Maria Noel, Allen, and O'Nan were present. The participants have competing recollections of what transpired. Noel doesn't recall Allen using the phrase "termination" during the meeting, but nonetheless Noel believed that Banks had been terminated at the meeting because Allen told Banks to turn over her ID badge and to leave that day, and Noel had never seen anyone who had merely been suspended have her badge taken away. Banks stated that she was fired on July 10, and that Allen had told her that she was both "suspended and terminated" during the meeting. Allen testified that during the meeting she told Banks she was suspended pending an investigation, and mentioned that it was "probable" that termination would result, but did not tell Banks that she was terminated.

Though the participants in the July 10 meeting left with different understandings of Banks's employment status, any ambiguity was resolved the following day when Reynolds sent Banks the first follow-up letter. Reynolds wrote that it appeared Banks had exhausted her FMLA, vacation, doctor's visit, and personal time off that could cover her late arrival earlier in the month, and that she had reached the suspension level for absences as well, so it appeared that

recent lateness and absence had put her at the termination level. He also noted that Banks had

not called in before her July 9 absence. Nonetheless, he further explained that:

> [B]efore a final decision is made we are requesting that we send you to a company doctor for a second opinion of your FMLA condition. It is possible based on the results of the evaluation we may have to reconsider a possible termination or it may confirm that the termination is in fact the correct decision.

R. 49-14, PID 835. The letter indicated that the appointment was scheduled for 10:30 a.m. on

July 16, 2012, provided the name and address of the doctor, and advised Banks that "[i]t is

extremely important that you keep this appointment." Reynolds concluded the letter by

explaining that "[u]ntil a final decision by the company can be made, you will be placed on paid

suspension."

In her deposition, Allen stated that the point of the doctor visit would be to determine

what in the building was triggering Banks's migraines and whether or not the company could

take action to accommodate Banks's perceived disability. Allen testified that if the doctor at the

IME had agreed with all of Dr. Burns's recommendations, Banks likely would have been

terminated because Dr. Burns's recommendations included things that were "not really even

within our control" and that were "quite extensive."

Banks did not attend the scheduled July 16 appointment. Reynolds sent Banks a follow-

up letter on July 23, 2012, indicating that "[a]s you failed to keep the previously scheduled [July

16] appointment . . . a new appointment has been made for August 2, 2012 at 1:00 PM." R. 49-

15, PageID 837. Reynolds gave Banks the name and address of the doctor, stated that "[i]f you

do not intend to keep this appointment please contact me . . . and a final decision will be made by

the Company based on the information at hand . . . You will continue to be on paid suspension

for now." On July 31, 2012, Reynolds sent Banks a third letter, stating that:

> You were not terminated. You were suspended with pay for excessive absenteeism, failure to call in, and failure to provide medical documentation. The only reason you have not been terminated is your claim that some of your attendance issues are related to a disability. The one doctor's note you provided to us does not specify a course of treatment or identify any reasonable restrictions on your job duties. You have not provided other medical documentation to cover your specific absences.
>
> We have referred you to an independent medical doctor in an effort to determine the extent of the restrictions on your return to work. You missed the first appointment. If you miss the second appointment, your absences will not be excused and your employment will be terminated.
>
> If you have any questions, please feel free to call me.

R. 49-16, PageID 839. Banks did not appear for the appointment. On August 7, 2013, Reynolds

sent Banks a final letter, stating that:

> As was previously communicated to you, you have exceeded the maximum number of absences allowed. You have claimed that your poor attendance was the result of a medical condition. As you have exhausted your FMLA leave, those absences would only have been covered if you could produced [sic] medical documentation confirming a covered disability and confirming that your specific attendance violations were related to that disability. We provided you with two opportunities to see a doctor, at the company's expense, to get that medical documentation and excuse your absences. You failed to show up for either appointment. Accordingly, your employment is terminated effective Friday August 3, 2012.

R. 49-17, PageID 841.

At her deposition, Banks acknowledged receiving the July 11 and July 23 letters but said

that there was nothing the company could have said in the letters to make her reconsider her

determination that she had been fired, so she did not attend either of the doctor appointments.

Banks argues that she was justified in concluding she had been terminated on July 10

because she was not paid for the period between July 10 and August 3 until September, instead

of on the regular employee payment schedule. But given Reynolds's repeated written statements

that Banks was suspended and had not been terminated, no reasonable juror could find that Banks could infer she had been terminated on July 10.

Banks also argues that Allen's emails reveal that she was having difficulty scheduling IMEs for the days Bosch told Banks that she had appointments, and there is some question about whether an IME was scheduled by July 16. Even if there were a problem with scheduling the IME for July 16, it was unknown to Banks and there is no indication that Allen failed to schedule the August 2 IME. Banks's testimony, moreover, was clear that she had no intention of going to either of the appointments because she insisted that she had already been terminated. In light of the clear and repeated statements in the letters that Banks had been put on paid suspension rather than being terminated, and that the medical appointments were an attempt to determine the extent of the restrictions on her return to work, we find that there can be no dispute that Banks was actually terminated on August 3, rather than July 10.

*b. The IME as part of the interactive process under the KCRA*

The ADA provides that an employer cannot require a medical examination to determine whether an employee is an individual with a disability or the nature or severity of the disability, unless the examination "is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Under the ADA, an employer's request for a medical examination is job-related and consistent with business necessity in cases where, as here, the employee has requested an accommodation. *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000); *see also* 29 C.F.R. pt. 1630, App. § 1630.14(c) (noting that 29 C.F.R. § 1630.14(c) permits employers "to make inquiries or require medical examinations necessary to the reasonable accommodation process").

Though Banks concedes that the ADA permits employers to require IMEs of employees in certain circumstances, she argues that because the KCRA has no language analogous to 42 U.S.C. § 12112(d)(4)(A), that provision of the ADA has no bearing on interpretation of the KCRA. This argument, however, ignores the provision in the KCRA that "[t]he general purposes of this chapter [the KCRA] are . . . [t]o provide for execution within the state of the policies embodies in . . . the Americans with Disabilities Act of 1990" and several other enumerated federal civil rights statutes. KRS § 344.020(a). Given this express statement of purpose in the KCRA itself, the Kentucky Supreme Court's statement that the KCRA is to be interpreted in accord with the ADA, *Schave*, 127 S.W.3d at 592, and the absence of a signal from the Kentucky legislature or courts that the ADA's provisions about medical examinations of an employee should *not* apply, we can only conclude that the KCRA tracks the ADA with respect to those provisions as well.

3. Conclusions regarding Banks's failure to accommodate claim

The record leaves no doubt that Banks was terminated on August 3 as opposed to July 10. Though scheduling an IME to confirm an employee's disability is permitted under Kentucky law when an employee has requested an accommodation, Banks refused to attend both IMEs Bosch scheduled for her before she was terminated. Nothing in the record indicates that Banks took any other action—such as objecting to the request for an IME or communicating an alternative— to continue the interactive process. We conclude that Banks's refusal to engage in the interactive process caused its breakdown and her claim for failure to accommodate fails.

**C. KCRA retaliation claim**

Banks alleges that Bosch retaliated against her because of her engagement in protected activity under the KCRA. When, as here, a plaintiff alleges a retaliation claim based on indirect

evidence, we employ the *McDonnell Douglas* burden shifting analysis. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009).

To establish a prima facie case for retaliation under the KCRA on an indirect evidence theory, Banks must show that: "(1) [s]he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against [her], and (4) there was a causal connection between the protected activity and the adverse employment action." *Id*. Here, the district court found that Banks had made out her prima facie case: she filed an EEOC complaint, Bosch knew it, Bosch suspended and then fired her, and the complaint and suspension were close enough in time to show causation.

Upon establishment of the prima facie case, the burden shifts to Bosch "to produce evidence of a legitimate, nondiscriminatory reason for its actions." *Id*. Bosch argues that Banks's termination was not retaliatory because she was given her full allotment of FMLA leave and several additional weeks, was put on paid suspension and given two opportunities to attend an IME at the company's expense, and was terminated for attendance and tardies after she herself backed out of the interactive process by failing to attend an IME while on paid leave.

Because Bosch met its burden of producing a nondiscriminatory reason for terminating Banks's employment, Banks has the burden of demonstrating that this legitimate reason is pretextual. *Id.* A plaintiff can show that an employer's proffered reasons for discharge are merely pretextual by demonstrating that they (1) "had no basis in fact," (2) "did not actually motivate the employer's action," or (3) were "insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009).

In addressing the reasons for her termination, Banks noted two of Reynolds's assertions in his letters to Banks—that she failed to call in her absence on July 9 and that she was at

termination level for absences—and asserts that these allegedly incorrect statements, along with Bosch's pattern of incorrectly calculating her leave, show that Bosch's proffered reasons for firing her were pretextual.

The district court noted that there were disputes of fact concerning whether Banks had called in to report her absence on July 9 and whether she was at the termination level or merely suspension level for absences, but held that here, even if Bosch's belief was wrong on either point, Bosch was saved by the "honest belief rule." The rule "provides that as long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998).

As this court has noted, "the 'honest belief' defense fits neatly into the retaliation context, where the legal standard inherently demands an employer's culpable mental state i.e., that the employee's exercise of FMLA [or ADA] rights *caused* the employer to *discriminate* against the employee." *Tillman v. Ohio Bell Telephone Co.*, 545 F. App'x 340, 351 (6th Cir. 2013). However, the honest belief rule is *not* applicable to claims where the employer's frame of mind is not at issue, FMLA interference claims for example. *Id.* There, an employer who honestly, but mistakenly believes that the employee used up all his FMLA leave can still be said to have interfered with the exercise of the employee's rights under the FMLA. *Id*. at 352. Though both types of claims are at issue in this case, the district court properly limited its application of the honest belief rule to its analysis of Banks's retaliation claims.

In this circuit, a party may only invoke the honest belief rule when the employer's belief is "reasonably based on particularized facts rather than on ignorance and mythology." *Smith*,

155 F.3d at 806  Even if the employer is able to point to particularized facts, "the protection of the rule is not automatic." *Id.* at 807.  The employee may rebut the rule by showing "proof to the contrary" nonetheless, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

Applying these principles, we hold that the district court did not err in its conclusion that Bosch relied on reasonably particularized facts when deciding to terminate Banks's employment on August 3, 2012.  Even assuming that Banks reported her absence on July 9 and that she was at the suspension point rather than the termination point for absences, Banks has not cited anything in the record that refutes Bosch's assertion that she had reached the termination level for tardies absent an accommodation that would cover that time, and the record leaves no doubt that she was the cause of the breakdown in the interactive process that could have resulted in such an accommodation.  These are "particularized facts" that support Bosch's decision to fire Banks.

Banks's more general argument that Bosch's miscalculations about her leave show its retaliatory intent must also fail.  She has not presented any evidence refuting Bosch's assertions that (1) its miscalculations were ultimately in her favor, or (2) had her leave not been coded as FMLA leave, it would necessarily have been coded as unexcused leave and led to her termination at an earlier date.  Moreover, when Banks grieved the inaccuracy of her FMLA leave calculation, Bosch Production Manager Steve Hargis attempted to meet with her to reach a correct calculation.  Banks instead withdrew the grievance and refused to discuss the matter further with Hargis, telling him that "us all meeting to compare my FMLA approvals was just a waste of time and stressful to me."  R. 49-2, PageID 722, 724-28.

Because Banks has not offered sufficient evidence to enable a reasonable trier of fact to conclude that Bosch's reasons for terminating Banks were pretextual, we affirm the district court's grant of summary judgment to Bosch on the KCRA retaliation claim.

## D.  FMLA retaliation claim

On appeal, Banks challenges the grant of summary judgment to Bosch with regard to her FMLA retaliation claim as well as her KCRA retaliation claim.  As with disability-related claims under the KCRA, FMLA-related retaliation claims based on indirect evidence follow the *McDonnell Douglas* burden shifting framework.  *Edgar*, 443 F.3d at 508.  Though Banks made her prima facie case for FMLA retaliation, summary judgment was properly granted to Bosch because, as with the KCRA retaliation claim discussed above, she has not shown that Bosch's proffered reasons for her termination were pretextual.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to Bosch.