Karen MEDLEY, Appellant,

v.

**VALENTINE RADFORD
COMMUNICATIONS,
INC., Respondent.**

**No. WD 64606.**

Missouri Court of Appeals,
Western District.

July 19, 2005.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 30, 2005.

Application for Transfer Denied
Nov. 1, 2005.

Michael J. Gallagher, Kansas City, MO, for Appellant.

Larry M. Schumaker, Kansas City, MO, for Respondent.

Before: THOMAS H. NEWTON, P.J., HAROLD L. LOWENSTEIN and PATRICIA A. BRECKENRIDGE, JJ.

THOMAS H. NEWTON, Presiding Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ms. Karen Medley began working for Valentine Radford in February 2001 as a media supervisor. She worked between fifty and sixty hours a week. She was responsible for negotiating and buying media for clients and for various other media distribution matters. Because she had already planned a vacation for March 2001, she was hired with the understanding that she could take a week off for that vacation without pay. As a part of her benefits, she was given five days of sick leave and fifteen days of vacation, in addition to the week off in March.

Ms. Medley missed a week of work in April 2001 due to a sinus infection. She then missed three weeks of work from June 25 to July 13 due to a "menstrual episode" and "fatigue." When she returned, she had used up all of her paid sick leave and vacation time for the year. A few months after Ms. Medley started at Valentine Radford, she began experiencing unusual menstrual periods with excessive bleeding and cramping. She was ultimately treated by Dr. Ryan Reynolds, a gynecologist, for a fundal uterine mass and diagnosed with menorrhagia and dysmenorrea. She began treatment for this by being placed on Depo Provera in September 2001. She followed Valentine Radford's policy to request short-term disability by filling out an Employee Statement and providing an Attending Medical Doctor's Statement and went on disability leave on September 16, 2001, with a return date of November 1, 2001.

Ms. Medley learned that, as a result of her health problems, she would be unlikely to ever have children. She began to experience depression, and in October 2001 she saw licensed clinical social worker Riley Bishop. He advised her that it would not be in her best interests to return to work immediately. Mr. Bishop wrote a note requesting additional medical leave for Ms. Medley, but because he is not a medical doctor, that note was not sufficient to entitle Ms. Medley to further medical leave. She did not return to work on November 1, 2001.

On November 12, 2001, Ms. Medley filled out another Employee Statement, describing her symptoms as fatigue, anxiety, and depression and stating that she had trouble doing normal daily functions. On November 19, 2001, Ms. Medley sent an email to Ms. Carla Brown, Human Resources Manager, telling her that she would submit the paperwork for her absence since November 1 "as soon as I can get a handle on it." Ms. Medley saw Dr. Reynolds, but he was not able to provide her with a medical excuse because he was only treating her for her physical problems, which were improving, and not her depression. Ms. Medley then made an appointment for December 11, 2001, with Dr. Walker, a psychiatrist, to get the proper paperwork. She sent Ms. Brown and Mr. Jeff Huggins, Vice President/Director of Operations, an email letting them know about her upcoming appointment with Dr. Walker. On December 4, 2001, Mr. Huggins sent her an email telling her that even after repeated requests they had no paperwork from a medical doctor stating she could not come back to work and so if she did not return by December 10 then he would accept that as her voluntary resignation.

Ms. Medley returned to work on December 5, 2001. She wrote an email to her

boss, Mr. Norm Olson, advising him of upcoming doctors' appointments and a family matter that would require her to miss various days of work. There was no objection to those missed days. Ms. Medley had a relapse of her physical problems and began missing work again on December 26, 2001. She sent an email to Mr. Olson each morning letting him know that she would not be able to work and explaining what her symptoms were. On January 2, 2002, she sent Mr. Olson an email explaining that she would not be able to work full-time for the rest of the week and had an appointment with Dr. Reynolds the next week to evaluate surgical options. She offered to come in for half days or to work from home in the interim. Mr. Huggins sent her an email and a letter on January 3, 2002, stating that because she had not been able to work on a regular basis and had not provided a valid doctor's excuse, "we have to assume that you have abandoned your position."

On January 25, 2002, Ms. Medley's attorney wrote to Mr. Huggins and Ms. Brown, demanding that Ms. Medley be reinstated and asserting that Valentine Radford had violated the Missouri Human Rights Act (MHRA) and the Americans with Disabilities Act (ADA). On February 8, 2002, Valentine Radford's attorney responded, denying liability and stating that Ms. Medley could reapply with the company. On February 27, 2002, Ms. Medley wrote to Ms. Brown to reapply and asked what she needed to do to pursue that. Mr. Huggins responded by sending Ms. Medley a letter telling her to email her resume to human resources where it would be reviewed if a position was available that met her qualifications. Nothing further happened regarding Ms. Medley's efforts to get rehired. Her former position was never filled; her duties were instead divided among other employees in her department.

Ms. Medley filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) and the Missouri Commission on Human Rights (MCHR), alleging that she was discharged because of her disability in violation of the MHRA, section 213.010, et seq.[1] On November 8, 2002, the MCHR issued its Notice of Right to Sue. Ms. Medley brought this lawsuit against Valentine Radford, alleging that it discharged her because of her disability, in violation of the MHRA, refused to reasonably accommodate her disability, and retaliated against her by not rehiring her because she opposed its refusal to reasonably accommodate her disability. The trial court granted Valentine Radford's motion for summary judgment. In its motion, Valentine Radford claimed that there was insufficient evidence to find that it violated the MHRA because it terminated Ms. Medley due to her failure to come to work regularly and insufficient evidence to find that it retaliated against her when it did not rehire her. Ms. Medley appeals.

Ms. Medley brings two points on appeal. She first claims that the trial court erred in granting Valentine Radford's motion for summary judgment on the claim of discrimination and refusal to accommodate. She claims that there were genuine issues of material fact as to whether Ms. Medley could establish a prima facie case of discrimination and refusal to accommodate. She next claims that the trial court erred in granting summary judgment on her claim that Valentine Radford retaliated against her by refusing to rehire her because she invoked her rights under the MHRA. She claims that there were disputed facts as to whether she could establish a prima facie case of retaliation.

---

1. Unless otherwise indicated, all statutory references are to RSMo. (2000).

319

## II. STANDARD OF REVIEW

The trial court shall enter summary judgment only if "the motion, the response, [and] the reply ...show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 74.04(c)(6). The appellate court reviews the grant of summary judgment essentially de novo. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). The record is reviewed in the light most favorable to the party against whom judgment was entered, and the non-movant is given the benefit of all reasonable inferences from the record. *Id.*

The moving party's entitlement to judgment as a matter of law revolves to a great extent around whether that party is the claimant or the defending party. *Id.* at 381. The claimant is the party "seeking to recover," and the defending party is the party "against whom a claim ... is asserted." Rule 74.04(a) & (b). Valentine Radford is the defending party. As the defending party, Valentine Radford is not required to controvert each element of Ms. Medley's claim to establish its right to summary judgment. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 381. Instead, Valentine Radford can establish its right to judgment by showing (1) facts that negate any one of Ms. Medley's elements; (2) that Ms. Medley, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of her elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support Valentine Radford's properly-pled affirmative defense. *Id.* Valentine Radford relied on the first method by negating Ms. Medley's claim that she fit within the MHRA.

■ To prevent summary judgment, Ms. Medley needed to show that there is a genuine dispute as to the facts underlying Valentine Radford's right to judgment. *See id.* If the parties disagree on the legal effect and consequences of the facts, and not the relevant facts themselves, there is not a genuine dispute of facts precluding summary judgment. *Betts–Lucas v. Hartmann*, 87 S.W.3d 310, 322 (Mo.App. W.D. 2002).

We will affirm a grant of summary judgment if the decision is correct "under any theory supported by the record developed below and presented on appeal." *Victory Hills Ltd. P'ship. I v. NationsBank, N.A.*, 28 S.W.3d 322, 327 (Mo.App. W.D.2000). "If the trial court's judgment does not specify the basis upon which summary judgment was granted, we will uphold the decision if it was appropriate under any theory." *Horneyer v. City of Springfield*, 98 S.W.3d 637, 639 (Mo.App. S.D.2003).

## III. LEGAL ANALYSIS

■ This case deals solely with the MHRA; Ms. Medley did not bring a claim under the ADA. But in deciding a case under the MHRA, we are guided by both Missouri law and any applicable federal employment discrimination decisions. *Mason v. Wal–Mart Stores, Inc.*, 91 S.W.3d 738, 741 (Mo.App. W.D.2002); *Pollock v. Wetterau Food Distribution Group*, 11 S.W.3d 754, 762 (Mo.App. E.D.1999).

### A. Discrimination and Refusal to Accommodate

Under the MHRA, it is unlawful for an employer to discriminate against or discharge any employee because of a disability. § 213.055. A disability is

a physical or mental impairment which substantially limits one or more of a person's major life activities, being re-

garded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job. . . .

§ 213.010(4). So in order to be disabled under the MHRA, a person must have an impairment that limits a major life activity and with or without reasonable accommodation that impairment must not interfere with performing a job. *Id.* This is the main difference between the MHRA and the ADA, which prohibits discrimination against a qualified individual with a disability. 42 U.S.C. § 12112(a) (1995). The MHRA makes the question of whether the job can be performed with or without reasonable accommodation a part of the test to determine whether an employee is disabled; not making reasonable accommodations is a type of discrimination under the ADA. *Devor v. Blue Cross & Blue Shield of Kansas City,* 943 S.W.2d 662, 666 (Mo. App. W.D.1997); 42 U.S.C. § 12112(b)(5)(A) (1995). Nonetheless, the definitions are similar enough that federal cases are instructive whenever Missouri cases do not answer a question. *See e.g., Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011, 1016 (8th Cir.2000) (when determining whether an individual can establish a prima facie case of discrimination under the ADA, one part of the inquiry includes determining whether the individual can perform the essential job functions, with or without reasonable accommodation).

■ "A reasonable accommodation is an accommodation that does not impose undue financial and administrative burdens on the employer or require fundamental alterations in the nature of the program." *Devor,* 943 S.W.2d at 666 (internal quotation marks and citation omitted). An employer must make reasonable accommodations to the known limitations of a handicapped employee or applicant, including making the facilities accessible and usable and job restructuring or part-time or modified work schedules. 8 C.S.R. 60–3.060(1)(G)(1) and (2).

Ms. Medley's complaint is that Valentine Radford did not even try to make a reasonable accommodation for her disability. Valentine Radford claims that Ms. Medley is not a disabled person under the MHRA, so we should not even consider reasonable accommodations. The first problem is that the parties claim that different prima facie elements apply to this case. Ms. Medley claims that her prima facie case is proof that: (1) plaintiff is a person with a disability within the meaning of the statute; (2) the employer had notice of the disability; (3) with reasonable accommodation plaintiff could perform the essential functions of the job; and (4) the employer refused to make such accommodations. *See Rodal v. Anesthesia Group of Onondaga, P.C.,* 369 F.3d 113, 118 (2d Cir.2004) (prima facie case when a disabled plaintiff shows, among other matters, that he or she can perform a particular job with a reasonable accommodation). But Valentine Radford claims that the prima facie case requires proof that: (1) plaintiff had a disability; (2) plaintiff was qualified to perform the essential functions of her job with or without reasonable accommodations; and (3) defendant discriminated against plaintiff because of her disability. *See Darby v. Bratch,* 287 F.3d 673, 682 (8th Cir.2002) (elements of prima facie ADA discrimination case).

■ But neither is using the Missouri prima facie case standard. In Missouri, the prima facie case under the MHRA requires the plaintiff to show that: (1) she is handicapped; (2) she was discharged; and (3) there is evidence from which to infer that the handicap was a factor in her discharge. *Devor,* 943 S.W.2d at 665.

There is also a three-step burden shifting analysis that must be followed for the plaintiff to win in a discrimination case. *See City of Clayton v. Mo. Comm'n on Human Rights*, 821 S.W.2d 521, 527–28 (Mo.App. E.D.1991). The plaintiff must establish her prima facie case first. So she must show that she is handicapped, which, under the statute, requires showing that she has an impairment but that with or without reasonable accommodation that impairment does not interfere with her job, and show the other two elements of her prima facie case. *See Devor*, 943 S.W.2d at 666. Once this burden is met, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its conduct. *Snyder v. ICI Explosives USA, Inc.*, 938 S.W.2d 946, 949 (Mo.App. S.D.1997). If the employer does this, the burden then shifts back to the employee/plaintiff to show that the reason is pretextual. *Id.* And "[u]nder the Missouri statute, the employer has an affirmative duty to reasonably accommodate an employee's handicap but the burden is on the employee to establish that with reasonable accommodation he could perform the job." *City of Clayton*, 821 S.W.2d at 529. Because Missouri law provides the prima facie case, we do not look to federal law for the prima facie case.

■ The parties cite numerous cases, the majority of which are federal, to try to show why or why not Ms. Medley was disabled and should or should not have been reasonably accommodated. The threshold issue is whether or not Ms. Medley is disabled within the statute. And as already stated, to be disabled under the MHRA, Ms. Medley must be able to show that she has an impairment but can work with or without reasonable accommodation. § 213.010(4). Since she was unable to work without accommodation, the question here is whether she can complete the es-

sential functions of her job with reasonable accommodations.

Ms. Medley wants to skip right to the prima facie test that considers whether or not Valentine Radford made an effort to reasonably accommodate her. But before we can even get to that test, we must first decide the threshold question of whether she is disabled under the MHRA. Even under her test, the first element is whether she is disabled under the statute. And she is not.

■ Ms. Medley missed a lot of work during her ten and a half months at Valentine Radford. And although most of that missed time was sick leave, vacation, and medical leave, she also missed an additional five weeks without taking proper medical leave before her final absences that resulted in her termination. She knew that she needed a statement from a medical doctor to have her leave extended past November 1, 2001, but she did not obtain that statement. And although she did return before she was able to see the psychiatrist, there is nothing in the record explaining why she was unable to get a statement from the psychiatrist to justify the five weeks that she had already missed. Then, after being back for less than three weeks, Ms. Medley had a relapse and missed work again. And although she said that she was going to see the doctor the following week, she did not provide Valentine Radford with any definite time that she thought that she might return. So Valentine Radford was left in a situation where its media supervisor appeared to no longer be dependable, regardless of the reason. And although Ms. Medley offered at that late time to work part-time or from home, that was after she had already missed a lot of work without complying with the company's leave policy.

"[R]egular and reliable attendance is a necessary element of most jobs." *Span-*

*gler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 850 (8th Cir.2002) (internal quotation marks and citations omitted). And an employee who cannot regularly come to work is not able to satisfy any functions of the job, let alone the essential ones. *Id.* According to Mr. Huggins, Ms. Medley's job required her to be in the office. He stated that it was not a part-time position and that working from home had been tried and had failed because of the special requirements of the position. So working part-time or from home was not an option and she could not be accommodated in that way. *See Kinnaman v. Ford Motor Co.*, 79 F.Supp.2d 1096, 1103 (E.D.Mo.2000) (the court defers to the employer's determination that regular and predictable attendance is an essential function of the job). There are certain jobs where such accommodation might be reasonable, but Ms. Medley's job was not one of them. Her job required her to be in the office, and, based on her own description of what she did, it was fast-paced. That type of job is not conducive to being done part-time or from home.

Her continued health problems and her failure to comply with the leave policies created a situation where there was no reasonable accommodation that would have allowed her to do her essential job functions. And the fact that she later got better is irrelevant because Valentine Radford had no way of knowing at that time how long this health problem would continue.

Ms. Medley relies on *Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir.2000), to claim that summary judgment should be reversed. In *Garcia–Ayala*, the plaintiff was out of work on short-term disability for over a year and was terminated under a company policy to not hold a job open for more than one year, even after she asked for additional leave.

*Id.* at 642. The First Circuit found that because Lederle did not contest the reasonableness of the accommodation of giving her more leave time, instead just saying that any leave past the one year was unreasonable, summary judgment for Lederle was inappropriate and plaintiff was entitled to judgment as a matter of law. *Id.* at 648–50. But *Garcia–Ayala* is different from the present case because the plaintiff in that case did comply with all of the company's policies to take her short-term leave and also was easily replaced by temporary workers while she was out. *Id.* at 642. Ms. Medley, on the other hand, missed a lot of work without following company policies to miss that work, and temporary workers could not fill her position. So she is not entitled to the same result.

Ms. Medley's case is more like *Kinnaman*. In *Kinnaman*, the plaintiff claimed that the defendant discriminated against her because of her disability, violating both the ADA and the MHRA. 79 F.Supp.2d at 1097. The plaintiff was a full-time hourly assembler at the Ford plant. *Id.* at 1098. In 1990, she began having various problems with her wrists, making it difficult for her to do certain assembler jobs. *Id.* at 1099. She took numerous medical leaves of absence, some related to her health problems and some not related. *Id.* After one such leave where she did not attempt to return until a month after her leave ended, defendant terminated her. *Id.* at 1100. When plaintiff objected, a settlement was reached wherein she would be reinstated if she successfully passed a physical and drug screen. *Id.* Based on restrictions placed on her due to her wrists, she was not reinstated. *Id.* The defendant moved for summary judgment. *Id.*

The court first focused on whether the plaintiff was a qualified individual under

the ADA. *Id.* at 1101. That question involves two steps: does the person possess the requisite skill and experience for the position and can the individual, despite her impairments, perform the essential functions of her job either with or without reasonable accommodation. *Id.* The court assumed that the plaintiff met the first step and focused on the second, finding that she could not prove that she could perform the essential functions of her job with or without reasonable accommodations. *Id.* at 1101–02. Plaintiff argued that the issue of her absenteeism was irrelevant because it was not raised as the reason that the defendant refused to reinstate her. *Id.* at 1102. But the court stated that plaintiff missed the point because her chronic, excessive absenteeism was "highly relevant to plaintiff's *prima facie* case which must first be addressed before any consideration can be given to the merits of the defendant's reason for refusing to reinstate plaintiff." *Id.*

The court discussed the essential functions of a job, which means the fundamental job duties of a particular position and noted that the Eighth Circuit has expressly found that regular and reliable attendance is necessary for most jobs. *Id.; see also Spangler,* 278 F.3d at 850. Regular attendance is essential since a plaintiff must be present to do the job. *Kinnaman,* 79 F.Supp.2d at 1103 n. 9. The court held that plaintiff did not establish that she could perform any of the functions of her job without accommodation because she could not perform an essential function of her job—attending work regularly. *Id.* at 1103. Because plaintiff did not identify or provide supportive evidence of any reasonable accommodation that would have enabled her to regularly attend work, she did not meet her burden of showing that she could perform the essential functions of her job with reasonable accommodation. *Id.* An employer is not required to put up with employees who do not come to work and is not required to provide indefinite leaves of absence. *Id.* at 1103–04. An indefinite leave is not reasonable because it does not actually allow the employee to work; the employee is not there. *Id.* at 1104.

Although there is no suggestion that Ms. Medley missed work for any reason other than her health problems, her case is otherwise similar to *Kinnaman.* She missed an excessive amount of work. She stayed away for five weeks after her approved leave of absence expired, even knowing that she had to provide a doctor's note. And she provides no explanation why she did not provide that note from the psychiatrist after she saw him to justify the five weeks that she had missed.

And like the plaintiff in *Kinnaman,* she is skipping the issue of her excessive absenteeism and trying to go straight to the question of whether or not Valentine Radford made an effort to reasonably accommodate her. But she has not answered the threshold question of whether or not she is disabled within the statute. Although she did get well over the next year after she was fired, when she was terminated Valentine Radford had no way of knowing when she would be able to work regularly. So she was not able to perform an essential function of her job—working regularly. And it was unreasonable to expect Valentine Radford to give her an indefinite leave of absence. *Kinnaman,* 79 F.Supp.2d at 1104. Ms. Medley's absences were irregular enough that Valentine Radford was unsure about her regular attendance in the future. And considering how generous Valentine Radford had already been in giving Ms. Medley time to return to work and provide them with the proper paperwork for her absence, it was not

unreasonable for Valentine Radford to end the employment relationship.[2]

We acknowledge that Ms. Medley had a horrible medical condition, but she also had ample time to comply with Valentine Radford's short-term disability policy to validate her missed work from November 1 on, and she chose not to do so. She was aware of the fact that she needed to provide a doctor's note, and her failure to do so left Valentine Radford in the awkward position of trying to accommodate her illness while having no proof of that illness under its policies. Although Ms. Medley's physical health problems were severe, Valentine Radford could not be expected to allow her to miss work regularly because of them. *See Pickens v. Soo Line R.R. Co.*, 264 F.3d 773, 775, 777–78 (8th Cir. 2001) (plaintiff was a conductor, hurt his back, and after he returned to work he would regularly make himself unavailable for work by exercising his right to "lay off" as needed *for his back problems*; employer was entitled to judgment as a matter of law on ADA claim because regular, reliable attendance was required and unfettered ability to not work was not a reasonable accommodation—plaintiff's suggested method of only working when he feels like it was not reasonable).[3]

Further, Ms. Medley has not suggested what type of accommodation would have allowed her to perform any functions of her job, let alone the essential ones. While it is true that her final emails requested being allowed to work part-time or from home, she had already missed five weeks without any sort of formal leave. And although she asked to work a modified schedule until she got back, she did not give Valentine Radford a possible return time, she merely said that she was going back to Dr. Reynolds the following week to discuss other medical options. Mr. Huggins stated in his deposition that her job was not a part-time or an at home job. She needed to be in the office to use the specialized software for her job. Ms. Medley did media buys for her clients, so she needed to be in the office and available to speak with her clients and the companies from whom she was making the buys. This could not be done from home, particularly when she was apparently so sick that she spent the majority of her time in bed and sleeping. *See Spangler*, 278 F.3d at 850 (plaintiff needed to be at work because her position required her to take daily phone calls, answer inquiries from other banks, complete transactions in a timely manner, and member bank customers relied on her for their daily cash needs). So her suggested accommodation did not enable her to do the essential functions of

---

**2.** Ms. Medley claims that she was still eligible for an additional fifty-eight days of short-term disability leave. But to arrive at this number, she is completely disregarding the five additional weeks that she missed work after her leave ended in November 2001. As she never provided Valentine Radford with the proper paperwork to take that time off, she did not use her short-term disability leave during that time. But she also had no vacation or sick leave left then and Valentine Radford was *simply* generous in waiting for so long before requiring her to return and in apparently not counting that time against her. We do not know how many days she should have left, but under the circumstances, it is unreasonable for her to claim fifty-eight days. Further, since she cannot prove that she was disabled under the MHRA, her available short-term disability leave is irrelevant.

**3.** Ms. Medley maintains that the court found against Mr. Pickens because he had his doctor falsify his ability to work and threatened to do so again. But although that was one reason supporting judgment for the employer, that was merely an additional reason, not the only one. *Pickens*, 264 F.3d. at 778. The court also found that his inability to attend work regularly meant that he could not work with *reasonable accommodation*. *Id.*

her job; it merely postponed her return. And Valentine Radford had already been accommodating up to the time that it terminated her.

Based on the facts, as Valentine Radford knew them in January 2002, there was no reasonable accommodation that would allow Ms. Medley to do her job. So Ms. Medley was not disabled under the MHRA and thus failed to prove an element of her claim. She did not satisfy her burden to show that with reasonable accommodation she could perform her job. *City of Clayton*, 821 S.W.2d at 529.

■ Further, even if Ms. Medley had met her burden and established her prima facie case, Valentine Radford offered a legitimate, non-discriminatory reason for her termination. *Id.* at 528. Valentine Radford fired Ms. Medley because of her excessive absences without any type of doctor's excuse, and it appeared that this problem would continue indefinitely. Although her excessive absenteeism was related to her health problem, she still missed a lot of work without following company policy and providing a proper doctor's note. It was reasonable for Valentine Radford to be concerned at that point that this would continue indefinitely. So this reason is legitimate and non-discriminatory. And Ms. Medley cannot, and did not, show that this reason is pretextual.

Therefore, Valentine Radford was entitled to summary judgment.

## B. Retaliation

■ Ms. Medley also claims that Valentine Radford retaliated against her when it did not rehire her after its attorney told her that she could reapply. The prima facie case for retaliation requires the employee to show that (1) she complained of discrimination; (2) the employer took adverse action against her; and (3) the adverse action was causally linked to the discrimination complaint. *Thompson v. Western–Southern Life Assurance Co.*, 82 S.W.3d 203, 207 (Mo.App. E.D.2002). If the employee meets this burden, the burden then shifts to the employer to show a legitimate, non-discriminatory reason for its actions. *Id.* If that burden is met, then the employee must present evidence showing that the employer's reason is a pretext for retaliation. *Id.*

Ms. Medley meets the first two elements of her prima facie case. She complained of discrimination after she was fired when her lawyer accused Valentine Radford of violating the MHRA. And not being rehired is arguably an adverse action against her.

■ The problem is whether she can demonstrate that the adverse action was causally related to her discrimination complaint. Valentine Radford claims that its decision to not rehire Ms. Medley was not related to her claim under the MHRA. It points out that no one was hired to replace her and that her duties were redistributed to other people in the department. Further, it appears that after Ms. Medley was told to submit her resume to human resources so that she could be considered for any appropriate positions, she did not do so. So she does not appear to have provided sufficient evidence to support a finding that the failure to rehire her was related to her discrimination complaint. And the fact that the failure to rehire happened only a month after she complained is not enough to change that. *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 715–16 (8th Cir.2000) (although a causal connection may be proven circumstantially by showing that the discharge followed the protected activity very closely in time, usually "more than a temporal connection between protected activity and an adverse employ-

ment action is required to show a genuine factual issue on retaliation exists").

Further, even if we found that Ms. Medley did supply a causal connection, Valentine Radford offered a legitimate, non-discriminatory reason to not rehire her to her old job. Her job duties were divided among the other people in the department, and so it was unnecessary to hire someone else.[4] And Ms. Medley has offered no evidence that this claim was pretextual. Further, we do not interpret the attorney's letter as an offer of reemployment to Ms. Medley, it was simply notice that she was free to reapply and that she would be considered if she did so. There was no guarantee that she would be offered a job, and Valentine Radford was not required to have her position open.

So summary judgment was properly granted on this point as well.

## IV. Conclusion

We sympathize with Ms. Medley, knowing that she suffered from a terrible health problem. The law, however, directs us to this result. There were no disputed facts, and Ms. Medley could not show that there was any reason to think that she could work with reasonable accommodation at the time that Valentine Radford terminated her. So she did not fit under the MHRA, and Valentine Radford was entitled to judgment as a matter of law. Hence, the trial court's grant of summary judgment in favor of Valentine Radford is affirmed. We also affirm the summary judgment in favor of Valentine Radford on the retaliation claim.

4. Ms. Medley complains that Valentine Radford cannot complain that it was a hardship to have other people cover Ms. Medley's duties while she was gone and then claim that it did not need to hire anyone for her position because the other employees had taken on those additional duties. But while this may appear to allow Valentine Radford to have it

HAROLD L. LOWENSTEIN and PATRICIA A. BRECKENRIDGE, JJ., concur.

both ways, it can also be interpreted another way. While Ms. Medley was still employed at Valentine Radford, they were her duties and the other employees were unexpectedly having to shoulder them. After she was terminated and the duties were redistributed, they became a part of the other employees' duties. So we perceive no conflict.