

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

ERIC QUALLS, )
)
Respondent, )
)
v. ) WD85799
)
) OPINION FILED:
MISSOURI HOUSE OF ) December 12, 2023
REPRESENTATIVES and DANIEL )
ADAM CRUMBLISS, )
)
Appellants. )

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable S. Cotton Walker, Judge**

**Before Division Two:** Mark D. Pfeiffer, Presiding Judge, and
Alok Ahuja and Thomas N. Chapman, Judges

The Missouri House of Representatives ("the House") and Mr. Daniel Adam

Crumbliss ("Crumbliss") appeal from the Circuit Court of Cole County, Missouri's ("trial

court") judgment after a jury verdict against appellants and in favor of Mr. Eric Qualls

("Qualls") on his claims of disability discrimination and unlawful retaliation under the

Missouri Human Rights Act ("MHRA"). We affirm.

**Factual and Procedural Background**[1]

The House is a legislative branch of the Missouri state government consisting of 163 State Representatives. The House is in session from January until mid-May of each year and employs twelve Legislative Analysts ("analysts"). When the House is in session, the state representatives work at the Missouri State Capitol Building ("State Capitol") to pass legislation. After mid-May, the state representatives depart the State Capitol for the "interim session." Qualls was employed by the House as an analyst from approximately January 2016 until his termination on March 28, 2017. During his term of employment, Qualls reported to the Director of the House Research Department ("Research Director"). Research Director, in turn, reported to Crumbliss, Chief Clerk of the Missouri House.

Prior to working at the House, Qualls was diagnosed with several mental health disorders, including Generalized Anxiety Disorder and Attention Deficit Hyperactivity Disorder ("ADHD"). According to Qualls's psychiatric records, Qualls's anxiety symptoms included "worry[ing] about everything," "possible panic attacks," and "some OCD[2] symptoms."

As a result of his disorders, Qualls found it hard to work in the workspaces he shared with other House analysts. Qualls started his employment working in an

---

[1] "We view the facts in the light most favorable to the jury's verdict." *Wynn v. BNSF Ry. Co.*, 588 S.W.3d 907, 909 n.2 (Mo. App. W.D. 2019). In reviewing a trial court's denial of a motion for JNOV, as here, "the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Darks v. Jackson Cnty.*, 601 S.W.3d 247, 254 (Mo. App. W.D. 2020).

[2] OCD refers to Obsessive Compulsive Disorder.

open-plan room that was "shaped like a half-donut" with cubicles in the basement of the State Capitol. According to Qualls, the basement office was "very, very loud" with "phones going off the hook." The basement office contained multiple printers, and Qualls had a refrigerator next to him and microwave units behind him. Qualls likened the noise of the basement office to a "boiler room," and stated that the front door was closing "all the time," with state representatives entering and exiting often each day and large tour groups sometimes coming through the space as well.

In June 2016, the basement office underwent renovations and the analysts were temporarily relocated to a committee room. Qualls found the committee room worse than the basement because the analysts' desks were arranged so that everyone was "looking at each other." To mimic the cubicle he had in the basement office, Qualls surrounded himself with boxes, a filing cabinet, and a bookshelf so he could "focus" and "feel safe." Despite these attempts, Qualls could not escape the noise and would sometimes "break down" and cry in a bathroom stall.

When the House was in session, Qualls's schedule fluctuated, and he worked over seventeen hours in one day "multiple times." Analysts were not paid "overtime" for hours worked beyond regular working hours, but did receive "compensatory time" that could be used during the interim session. By the end of the first session, Qualls had accumulated more than 200 hours, or more than a month, of compensatory time.

Though he worked long hours, Qualls did not spend all his time working in the shared workspaces. Qualls was assigned to research education law, and his work took him all over the State Capitol, including state representative offices, the House floor, and

3

committee rooms. Qualls spent roughly half his time meeting with state representatives. One of Qualls's primary job responsibilities as an analyst was summarizing the state representatives' bills and legislation to assist the public in understanding new laws. Summarizing legislative bills required Qualls to first read the bill, then explain the essence of the bill at a sixth-grade reading level. These bills ranged from one page to one-hundred pages and sometimes involved complex issues.

Other primary analyst responsibilities included attending committee meetings and making amendments to bills whenever an amendment was requested by any of the 163 state representatives. Qualls would draft most of the amendments in his cubicle, but would sometimes write amendments in the committee meetings. Because of his difficulties concentrating in the open-plan workspaces, Qualls often worked weekends to "do more" summaries and amendments when it was "much quieter."

Qualls's bill summaries were ultimately submitted to Research Director for approval. Some of Qualls's summaries had to be corrected. These corrections were referred to as "redos." Certain "redos" involved little more than changing a date. These "redos" only took a few minutes to complete. By contrast, some of Qualls's summaries needed to be rewritten by other House staff. Staff would then send the summaries back to Qualls for his review and further corrections, or straight to Research Director for approval. Other analysts also had summaries of their own returned for "redos."

If his performance was unsatisfactory, Qualls understood and expected Research Director would inform him of the same. To that end, the House had a Progressive Disciplinary Policy ("the Policy") that required each supervisor to keep supervisees

4

"informed of their status." The Policy states that House employees are expected to provide "prompt, courteous, and efficient service" and to "comply strictly with all laws, rules, and regulations applicable to their activities." The Policy further states: "The purpose of disciplinary action is to correct problem situations, provide an atmosphere in which the employee can learn from past mistakes, and to minimize the employee's loss of dignity and self-esteem. Disciplinary action should not be undertaken with the intent to punish." The progressive disciplinary steps of the Policy are: an informal counseling, a written warning and counseling, probation, and finally, suspension or termination. Reasons for termination outlined in the Policy include breach of trust, dishonesty, illegal conduct, insubordination, and absence of three consecutive workdays without reporting to the employee's supervisor.

Not only did Qualls *not* receive any discipline for his first legislative session worked through May of 2016, but on June 7, 2016, he and other analysts received an e-mail from Research Director stating, "I couldn't be more proud of our office and how each office member handled the stress, sleep deprivation, and toll that working long hours takes on a person." And, on July 11, 2016, Qualls received a four percent pay raise.

On August 2, 2016, Qualls received a favorable performance evaluation completed by Research Director for the performance period ending July 2016. In the evaluation, Research Director stated that Qualls "earned the respect of his committee members by quickly learning the complex area of education law." Research Director also praised

5

Qualls's professionalism while noting her goal for Qualls to focus on improving his timeliness for completion of work assignments.

During the 2016 interim session, Qualls was not tasked with drafting summaries or amendments as he was when the House was in session. However, he was assigned to follow the MU Review Commission and Dyslexia Task Force, a committee that met at various Missouri college campuses. Qualls was late to one such committee meeting at the University of Missouri-Kansas City ("UMKC") in October 2016, but only because he could not find parking on campus. His tardiness for this meeting was never documented as any sort of work deficiency in Qualls's personnel file, and Qualls received no immediate feedback that his tardiness to this one meeting was any sort of a workplace issue.

When Crumbliss was asked to review Qualls's personnel file at trial, he confirmed that Research Director never issued a written warning to Qualls and Qualls was never placed on probation or suspended. Crumbliss further admitted that, apart from the July 2016 evaluation advising Qualls that he needed to work on completing tasks in a timely manner, his personnel file contained no record of nonperformance.

On January 4, 2017, Research Director sent an e-mail to multiple House staff members, including Qualls. The e-mail stated in relevant part, "It looks like the weather could be iffy in the morning, especially for those of you living up north. Do NOT try to come in if it might be unsafe. It's not worth it, and you'll have plenty of hours to cover the few or 8 that you would miss tomorrow." On January 5, 2017, it did snow and Qualls felt unsafe driving. Accordingly, he sent a message to the House's scheduler, letting her

know that he would be late because the "[r]oads don't look great." Qualls arrived at the State Capitol by 11:00 a.m.

The very next day, Research Director sent an e-mail to Crumbliss and the Human Resources Director ("HR Director"), denying a salary raise to Qualls that had been given to all other analysts.

On February 9, 2017, Qualls met with Research Director to discuss Research Director's abrupt negativity towards Qualls. At the meeting, when Qualls pressed Research Director for any examples of poor job performance, the best Research Director could come up with was concern about Qualls being late to work on the snow day in January after Research Director had pre-approved a delayed arrival; she expressed concern, for the first time, about Qualls being late for the UMKC meeting four months earlier, even though this issue had never before been raised and Qualls's parking dilemma that day was the reason for his tardiness, not that he had overslept or was intentionally late; and finally, Research Director mentioned that a certain lobbyist had complained about Qualls's late summaries, though she immediately discounted that lobbyist's opinion because the lobbyist was hard for everyone to get along with.

Following the February 9, 2017 meeting, Qualls constantly felt "cornered" and made several attempts to schedule a meeting with Crumbliss to discuss Research Director's unfair criticism leading to him being unfairly punished as the only analyst not receiving a pay raise in February 2017. After several failed scheduling attempts with Crumbliss's office, Qualls sent a letter to Crumbliss dated February 22, 2017. In this letter, Qualls documented Research Director's supervisorial workplace violations (failing

to promptly notify Qualls that Research Director was dissatisfied with Qualls's tardiness at the UMKC meeting in October 2016), dishonesty (first urging he and other staff to stay home instead of travel in inclement snowy weather a month earlier, but then criticizing Qualls for taking the travel safety advice), and discriminatory misconduct in singling out Qualls for a denied pay raise given to all other analysts without any legitimate basis for doing so.

Upon receipt of Qualls's letter, Crumbliss scheduled a meeting with Qualls that took place on February 24, 2017. At that meeting, Crumbliss expressed that there was no "big issue" or "ring the bell warning situation" with Qualls's performance meriting any discipline whatsoever. And, though there was nothing in Qualls's personnel file documenting any specific instances of work performance timeliness issues, Crumbliss brought that topic up with Qualls.

Consequently, on March 9, 2017, Qualls sent an e-mail to Crumbliss referring back to his February 22, 2017 letter documenting Research Director's supervisorial misconduct and expressly addressing Crumbliss's comment about the issue of work performance timeliness by notifying Crumbliss of his preexisting anxiety disorder "which fits the definition of a disability under the ADA" and requesting that Crumbliss provide reasonable accommodation for his disability.

Crumbliss ignored Qualls's March 9, 2017 e-mail. Likewise, he did not forward the e-mail to the HR Director (who was also the Director of the Division of

Administration[3]), even though the HR Director was responsible for processing accommodation requests for the House.

On March 22, 2017, Qualls wrote to the HR Director to express his concern that nobody had responded to his March 9, 2017 accommodation request. This resulted in a March 28, 2017 meeting between Qualls and the HR Director, Crumbliss, Research Director, and Counsel for the House.

Prior to the March 28, 2017 meeting, Qualls exchanged multiple e-mails with the HR Director on March 27, 2017, and Crumbliss was copied on the e-mail exchange. In the March 27 e-mail exchange, Qualls complained that the House had failed to fulfill its legal obligation to expeditiously respond to his accommodation requests. Qualls also objected to his immediate supervisor attending the March 28 meeting. Qualls expressed concerns that his immediate supervisor had previously disclosed his confidential health information to other employees; he also stated his view that her attendance at the March 28 meeting was unnecessary to address his accommodation requests. Given the delays and the participation of his immediate supervisor, Qualls stated his belief that the House was not engaging in "a good faith effort" to address his accommodation requests.

In the March 28, 2017 meeting, Qualls proposed several alternative possible accommodations to aid with his production including (1) providing a quieter workspace; (2) the ability to telework during the interim session when Qualls was having a "bad"

---

[3] The Division of Administration served two functions for the House—a human resources function and an accounting function. During the relevant time period, the House employed roughly 400 employees and had an operating budget exceeding $22 million.

anxiety day; (3) having a third-party consultant evaluate his workspace; (4) a change in subject areas; and (5) a keypad on the exterior door to his basement office.

HR Director believed none of Qualls's requested accommodations seemed unreasonable, and she made a note to have an outside party evaluate Qualls's workspace—something the House had done for a previous employee. And, while Research Director would later acknowledge that allowing Qualls to telework during the interim session would not "greatly impact" the Research Department and Research Director and Crumbliss also conceded that *all* analysts would have the opportunity to switch subject areas at the close of the Spring 2017 legislative session, the House Counsel scoffed at Qualls's suggestion for a quieter workplace station because it "sounds like you're asking for [a] private office."

Thereafter, the meeting moved away from Qualls's proposed accommodations to his performance. Qualls expressed his disapproval stating, "So, we're addressing performance issues after I've requested an accommodation, the lack of which is affecting my performance?" Qualls further commented that he was extremely frustrated that he had raised concerns with Research Director and Crumbliss about House Policy violations and unfair discriminatory practices in singling him out for a denied pay raise without justification and that he was again being *attacked* for his disability instead of any agreement by the House to take steps to *accommodate* his disability. Qualls continued that he felt he may have no other choice but to raise his concerns to the Missouri Human

Rights Commission ("MCHR").  Minutes after Qualls mentioned the MCHR, Crumbliss fired Qualls on the spot.[4]

Qualls then pursued employment disability discrimination and unlawful retaliation claims under the MHRA against the House and Crumbliss, which ultimately resulted in a six-day jury trial in April 2022 before the trial court and a jury verdict of both compensatory and punitive damages in favor of Qualls on these claims.  The House and Crumbliss filed Motions for judgment notwithstanding the verdict ("JNOV"), which the trial court denied.  Thereafter, on September 30, 2022, the trial court entered judgment consistent with the jury's verdict.  This appeal by the House and Crumbliss (collectively "Appellants") timely followed.

## Points on Appeal

Appellants assert two sufficiency-of-the-evidence points on appeal.  In Point I, Appellants contend the trial court erred in denying the motion for JNOV because Qualls failed to make a submissible claim that he was "disabled" under the MHRA, and, in Point II, Appellants contend the trial court erred in denying the motion for JNOV because Qualls failed to make a submissible claim for retaliation.

## Standard of Review

"The standard of review of the denial of a JNOV is essentially the same as the overruling of a motion for directed verdict."  *Darks v. Jackson Cnty.*, 601 S.W.3d 247,

---

[4] Despite Crumbliss's claims that he had received approval from the Speaker of the House to fire Qualls on March 28 and that he had also discussed the possibility of termination with the HR Director beforehand, both the Speaker of the House and the HR Director testified that they could not recall such discussions.

254 (Mo. App. W.D. 2020) (quoting *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 14 (Mo. banc 2012)). "A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence." *Id*. (quoting *Moore v. Ford Motor Co*., 332 S.W.3d 749, 756 (Mo. banc 2011)). "Substantial evidence is evidence, which, if true, is probative of the issues and from which the jury can decide the case." *McKinney v. Mercy Hosp. St. Louis*, 604 S.W.3d 680, 686 (Mo. App. E.D. 2020). "Whether a plaintiff has made a submissible case is a question of law subject to *de novo* review, but the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Darks*, 601 S.W.3d at 254 (citation and internal quotation marks omitted). "Indeed, '[t]he jury's verdict will be reversed only if there is a complete absence of probative facts to support the jury's conclusion.'" *Id*. (alteration in original) (quoting *Keveney v. Mo. Mil. Acad*., 304 S.W.3d 98, 104 (Mo. banc 2010)).

## Point I – Disability Discrimination

In their first point on appeal, Appellants contend the trial court erred in denying their motion for JNOV because Qualls did not make a submissible claim that he was "disabled" under the MHRA in that: (1) he was unable to perform the essential job functions of analyst with or without an accommodation; and (2) none of the accommodations suggested by Qualls would have aided his ability to perform the essential job functions of analyst.

The MHRA makes it unlawful for an employer to discriminate against an employee, or terminate an employee, because of a disability. § 213.055;[5] *see also Medley v. Valentine Radford Commc'ns, Inc.*, 173 S.W.3d 315, 319 (Mo. App. W.D. 2005). To establish a *prima facie* case of disability discrimination under section 213.111 of the MHRA, an employee must show that: "(1) the [employee] is legally disabled; (2) the [employee] was discharged; and (3) the disability was a factor in the [employee's] discharge." *Hervey v. Mo. Dep't of Corr.*, 379 S.W.3d 156, 160 (Mo. banc 2012). A qualifying MHRA "disability" is:

> a physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job . . . .

§ 213.010(5).

Thus, satisfaction of the *prima facie* disability prong turns on an employee's ability to prove that he (1) "had, was regarded as having, or had a record of having, an impairment that substantially limits a major life activity" and (2) "that, with or without reasonable accommodation, the impairment does not interfere with performing the essential functions of [his] job." *Ashby v. Woodridge of Mo., Inc.*, 673 S.W.3d 537, 544 (Mo. App. S.D. 2023) (citing *Folsom v. Mo. State Highway Patrol*, 580 S.W.3d 645, 650 (Mo. App. W.D. 2019); *Medley*, 173 S.W.3d at 320)). "[I]f despite the substantial limitation the physical impairment otherwise causes, the employee *can* perform the essential functions of his job with or without a reasonable accommodation, then he has a

---

[5] Statutory references are to REVISED STATUTES OF MISSOURI 2017, unless otherwise indicated.

13

'disability' for purposes of the MHRA." *Loerch v. City of Union Mo.*, 643 S.W.3d 597, 602 (Mo. App. E.D. 2022) (emphasis added); *see also Devor v. Blue Cross & Blue Shield of Kansas City*, 943 S.W.2d 662, 666 (Mo. App. W.D. 1997) ("[E]mployees with an impairment but who *can* perform their job with or without reasonable accommodation *are considered handicapped* under the statute.") (emphasis in original). Conversely, if an employee *cannot* perform the essential functions of his job with or without accommodation, he is not disabled under the MHRA. *Devor*, 943 S.W.2d at 666.

Appellants do not contest that Qualls had substantial impairments that limit a major life activity. Rather, Appellants assert Qualls did not fulfill the second part of the disability prong because he did not produce evidence showing he could perform the job of analyst with or without reasonable accommodation. The parties agree essential functions of the analyst position included (1) drafting bill summaries, (2) attending committee hearings, and (3) managing floor amendments.

*A.    Committee Meetings*

Qualls produced substantial evidence showing he could attend committee meetings without accommodation. The record reflects that Qualls's supervisors were actually pleased with his performance leading up to the 2017 legislative session. Specifically, Qualls's immediate supervisor sent him an e-mail commending him and his fellow analysts for "handl[ing] the stress, sleep deprivation, and toll that working long hours takes on a person." And, Qualls received a pay raise after the 2016 legislative session.

14

Subsequent to the pay raise, Qualls's immediate supervisor praised his professionalism and commented in his performance evaluation that Qualls had "earned the respect of his committee members by quickly learning the complex area of education law." While positive performance evaluations are not alone determinative of an employee's ability to complete the essential functions of their position, they are an important consideration. *See, e.g., McKinney*, 604 S.W.3d at 687 ("Respondent presented evidence of having received positive performance reviews from Appellant, as well as testimonial evidence from individuals who witnessed the results of Respondent's work and who found it satisfactory."); *Bowolak v. Mercy E. Communities*, 452 S.W.3d 688, 692-99 (Mo. App. E.D. 2014) (holding that a plaintiff was able to perform the essential functions of his job without restrictions where he consistently received positive job assessments and never missed work due to his back issues).

At trial, Crumbliss testified that Qualls did *not* exhibit any performance issues meriting discipline for all of 2016.[6] According to Research Director, Qualls began demonstrating "prevalent" issues with "lateness" in January of 2017. However, the record belies this assertion. There is not one single reference in Qualls's personnel file documenting any warnings or disciplinary commentary relating to such "prevalent lateness." Instead, when pressed to identify specific instances of non-attendance, Research Director could not recall any committee meetings missed by Qualls apart from excused absences due to illness. Nor could she recall any credible complaints from

---

[6] This would necessarily contradict any suggestion that Qualls's tardiness at the October 2016 UMKC meeting was anything other than a legitimate parking issue.

15

committee members related to attendance. Nor could Research Director make any plausible suggestion that, after she had expressly directed her staff to take road travel cautions in anticipation of a January 2017 snowstorm, Qualls was somehow "late" when he took Research Director's advice and waited until the roads had cleared after the snowstorm to commute to the Capitol building.

Viewing this record in the light most favorable to the verdict, Qualls presented substantial and probative evidence that he could attend committee meetings without accommodation.

## B.     *Summaries and Amendments*

Conversely, Qualls did require accommodations to complete his other job functions. When asked if he was "behind" on summaries, Qualls answered in the affirmative. Qualls also admitted to having summaries returned for corrections. As a result, Qualls actually engaged in *self-help* by working on weekends to catch up on summaries and amendments he was unable to complete during the week. In other words, though he was not paid overtime for working on the weekends, Qualls chose to work weekends because he found that working in a quiet space allowed him to more productively complete work assignments. And, upon doing so during the 2016 legislative session, the response of Qualls's immediate supervisor was to praise him for his professionalism in "earning the respect of his committee members by quickly learning the complex area of education law" and to likewise express pride in Qualls for handling "the stress, sleep deprivation, and toll that working long hours takes on a person." To suggest that making a "quiet space" workplace accommodation for Qualls *during the weekdays of*

16

*the workweek* would have been useless is to ignore this substantial evidence of the *actual* effectiveness Qualls had achieved by self-accommodating himself on the weekends.

"A reasonable accommodation is an accommodation that does not impose undue financial and administrative burdens on the employer or require fundamental alterations in the nature of the program." *Devor*, 943 S.W.2d at 666 (internal quotation marks omitted). State regulations set out a non-exhaustive list of factors to determine whether an accommodation is reasonable under the MHRA. *See Loerch*, 643 S.W.3d at 606 (applying 8 CSR § 60-3.060(1)(G) factors to accommodation analysis in MHRA employment case). These factors include the cost and nature of the needed accommodation, the nature and size of the business (*e.g.*, the type and number of facilities and composition of the work force), and good faith efforts previously made by the employer to accommodate similar disabilities. *See* 8 CSR § 60-3.060(1)(G)(3). Ultimately, "[w]hether any particular proposed accommodation is unreasonable is dependent upon the facts of each case." *Lomax v. DaimlerChrysler Corp.*, 243 S.W.3d 474, 481 (Mo. App. E.D. 2007) (citing *Medley*, 173 S.W.3d at 321-23).

Along with proposing the provision of a quieter workspace, Qualls proposed several other alternative accommodations during his March 28, 2017 meeting with Crumbliss and other supervisorial management persons with the State. These included providing him the ability to telework during the interim session when Qualls was having a "bad" day, having a third-party consultant evaluate his workspace, a change in subject areas, and a keypad on the exterior door to his basement office.

Appellants argue (1) that none of Qualls's proposed accommodations were reasonable and (2) even if his proposed accommodations were reasonable, they would not have aided his performance. Appellants' arguments ignore the substantial evidence presented at trial on these topics.

Appellants' first argument is directly contradicted by HR Director's testimony that *none of Qualls's proposed accommodations "seemed unreasonable to [her]."* HR Director had a master's degree in business administration with an emphasis in HR and had previously served as the Director of HR at the Public Service Commission. As the person who took care of accommodation requests for House employees, HR Director was in the best position to know what accommodations best conformed to the House's administrative and budgetary constraints—especially because her position with the House included both HR and fiscal components. Given her unique qualifications, HR Director's testimony alone is sufficient and substantial evidence supporting the submissibility of the reasonableness of the accommodations requested by Qualls.[7]

---

[7] Additionally, Qualls produced other substantial evidence on the topic of the reasonableness of the accommodations he requested. Specifically, he has produced evidence that his requests would not alter the fundamental nature of the House's functions. *See Devor v. Blue Cross & Blue Shield of Kansas City*, 943 S.W.2d 662, 666 (Mo. App. W.D. 1997) ("A reasonable accommodation is an accommodation that does not . . . require fundamental alterations in the nature of the program.") (internal quotation marks omitted). At the March 28, 2017 meeting, Research Director stated that Qualls's request to telecommute during the interim session would not "greatly impact" the research department, and Crumbliss stated that he would be okay with a wide application of telecommuting as long as it did not conflict with House policy. Research Director and Crumbliss also acknowledged that changing subject areas was a choice available to all analysts at the close of the 2017 spring session. As for accommodations aimed at restructuring Plaintiff's workspace, HR Director testified that the House previously employed a third party to conduct a workspace evaluation. This past good faith effort to

As to Appellants' second argument, it is readily apparent that Qualls's proposed accommodations for a quieter office and keypad would have aided his performance by limiting interruptions. Qualls testified that the open-plan office negatively impacted his anxiety, and unable to find "peace and quiet," he would sometimes break down and cry in a bathroom stall. He further testified that due to his disabilities, he had difficulty reading and summarizing bills in the "very, very loud" shared spaces. Qualls frequently came into the office on weekends because he was able to "do more" when he did not have to contend with the "boiler room" like activity of weekdays—which included constantly ringing phones, noisy appliances, and Representatives "barg[ing] in." In Qualls's words, "So the things like summaries, long amendments, if there was research, things like that, a quieter workspace would make a big difference." And, as Qualls himself *proved* by working on the weekends when his workplace was quiet, creating that quiet space positively influenced his work product.

Regarding a change of subject areas, Qualls testified that the education subject area had "one of the busiest" committees. He further testified that some of the bills he had to summarize were over one-hundred pages long and involved extremely "complex" issues. On this evidence, a jury could reasonably surmise that a less demanding subject area would have allowed Qualls to fulfill his summary and amendment job functions better. And, Research Director and Crumbliss both *admitted* that they were already planning on giving *all* analysts the opportunity to switch subject areas after the 2017

accommodate an employee favors a finding of reasonableness under State regulations. *See* 8 CSR § 60-3.060(1)(G)(3).

legislative session anyway. Hence, by their own actions, both were conceding the reasonableness of such an accommodation request, and, presumably, Research Director and Crumbliss were not proposing to take such change-of-subject-area steps with their analysts unless they believed there was a value to the entire research department in doing so.

Simply put, Qualls presented sufficient and substantial evidence that was probative on the issue of Qualls's qualifying disability under the MHRA, and Qualls has, thus, demonstrated on this record a submissible case relating to Qualls's disability discrimination claim.[8]

---

[8] Appellants cite to *Devor*, but their reliance is misplaced. In *Devor*, unlike here, the employer had made *three* reasonable accommodations for the employee, and *after* doing so, the employee continued to demonstrate that he was unable to perform his job functions satisfactorily. *Id.* at 664-65. Here, Appellants complain that Qualls's behavior of habitually arriving late to work and turning in late work assignments disrupted the workplace. Setting aside the utter lack of any documentation in the present case suggesting that Qualls was chronically late to work, Appellants' argument ignores the fact that the *Devor* plaintiff was unable to perform satisfactorily *after* multiple workplace accommodations were made for the *Devor* plaintiff. Here, Appellants seek to draw their legal conclusion of the "ineffectiveness" of any reasonable accommodation where Appellants *never offered one single accommodation to Qualls*. Instead, Appellants assert that, even though Qualls worked on the weekend to gain a "quiet space," he still was late with some of his work assignments. Thus, they argue, any attempt to provide Qualls a "quiet space" would have been futile. This self-serving argument is unpersuasive given our deferential standard of review. The work Qualls did on the weekend does not translate to a quiet workspace throughout the workweek—which is what Qualls was requesting. Further, by taking it upon himself to work on the weekends, Qualls generated supervisorial praise for his professionalism, the respect of the education committee, and pride from House leadership for his ability to work long hours. We reject Appellants' attempt to compare the present disability discrimination scenario to that of the *Devor* case.

20

Point I is denied.[9]

## Point II – Unlawful Retaliation

"Section 213.070(2), RSMo makes it an unlawful discriminatory practice to retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter." *McCrainey v. Kansas City Mo. Sch. Dist.*, 337 S.W.3d 746, 752-53 (Mo. App. W.D. 2011) (internal quotation marks omitted).

In Point II, Appellants contend the trial court erred by denying the House's motion for JNOV because Qualls failed to make a submissible claim for retaliation in that he did not engage in a protected activity. Appellants rely on *Li Lin v. Ellis*, 594 S.W.3d 238 (Mo. banc 2020), for the proposition that "a mere request for an accommodation" does not qualify as protected activity under the MHRA.[10] This case, however, is *not* a claim of retaliation relating to "a mere request for an accommodation."

---

[9] Appellants also argue in their Reply Brief that Qualls's proposed accommodation of having a third-party workspace evaluator would pose an undue financial burden. First, having not raised this argument in their original appellate brief, Appellants cannot raise this argument for the first time in their Reply Brief. *Arch Ins. Co. v. Progressive Cas. Ins. Co.*, 294 S.W.3d 520, 524 n.5 (Mo. App. W.D. 2009) ("A reply brief is to be used only to reply to arguments raised by respondents, not to raise new arguments on appeal."); *Harrison v. DeHeus*, 230 S.W.3d 68, 76 n.5 (Mo. App. S.D. 2007) (same). Second, with a workforce of 400 employees and an annual operating budget exceeding $22 million, any payment for a consultant would be a minimal outlay, which favors "reasonableness" of the accommodation. *See* 8 CSR § 60-3.060(1)(G)(3); *see also*, *Baldridge v. Kansas City Pub. Sch.*, 552 S.W.3d 699, 710 n.8 (Mo. App. W.D. 2018) (noting that the cost of providing a paraprofessional in a school setting was "miniscule" relative to the school district's budget). More importantly, the House had *previously paid for a consultant to perform the very workplace evaluation task that Qualls had requested, and HR Director felt like the request was reasonable and had even made a note to contact the same workplace evaluator she had previously used.* Accordingly, we reject Appellants' "undue financial burden" suggestion.

[10] *Li Lin v. Ellis*, 594 S.W.3d 238 (Mo. banc 2020), involved a university research employee who sued her employer after she requested transfer to a new position that

21

In contrast to *Li Lin*, the verdict director submitted to the jury in the present case contained a series of disjunctive submissions on the issue of "protected activity":

First, [Qualls] engaged in the protected activity of:

- making complaints of discrimination on the basis of disability, or

- opposing discrimination on the basis of disability, or

- stating he was going to contact the Missouri Commission on Human Rights to his superiors in good faith[.]

Appellants argue that Qualls's requests for accommodation made during the March 28, 2017 meeting do not count as a protected activity. This argument does not refute the probative value of *any* of the disjunctive submissions made to the jury. Put differently, the disjunctive submissions rest on different grounds than mere accommodation. In fact, none of them include the word accommodation. And, Appellants do not contest on appeal that any of the disjunctive submissions submitted to the jury in the verdict director were lacking in substantial evidence supporting the disjunctive submission of these "protected activities" to the jury.[11]

---

would accommodate her back injuries. *Id.* at 240-41. The plaintiff's request for accommodation is the only "protected activity" that was submitted to the jury in support of the plaintiff's retaliation claim. *Id.*

[11] Moreover, the factual record does support each of these disjunctive submissions. Qualls's February and March 2017 written communications conveyed his report of complaints of disability discrimination and his opposition to the conduct of his superiors that he believed constituted discrimination based upon his disability. *See McCrainey*, 337 S.W.3d 746, 754 (Mo. App. W.D. 2011) ("While a violation of an employer's policy may not constitute a violation of the [Missouri Human Rights Act ("MHRA")], it would not be unreasonable under the circumstances of this case for McCrainey to believe that [supervisor's] conduct was unlawful."). Finally, Qualls identified numerous specific examples of why he believed he needed to take his concerns to the Missouri Human

Point II is denied.

## Conclusion

The judgment of the trial court is affirmed. However, we remand the cause to the trial court for the limited purpose of awarding attorney's fees to Qualls, the prevailing party on appeal.[12]

_Mark D. Pfeiffer_
Mark D. Pfeiffer, Presiding Judge

Alok Ahuja and Thomas N. Chapman, Judges, concur.

----

Rights Commission ("MCHR")—that Research Director had acted recklessly and dishonestly with regard to the January snow event, that Research Director had violated House policies on employee discipline, that management was not responding to his requests for accommodations in good faith or in a timely fashion, and that the House supervisors in the March 28, 2017 meeting were aggressively attacking Qualls regarding performance issues instead of addressing accommodation issues that were supposed to be the subject matter of the meeting. Qualls's reference to the MCHR was not a vague reference or disclosure as argued by Appellants; instead, it was based upon specific instances of why he believed his legal rights were violated. Such specificity qualifies as protected activity. *See Mignone v. Mo. Dep't of Corr.*, 546 S.W.3d 23, 38 (Mo. App. W.D. 2018) (a plaintiff need only have "a reasonable good faith belief that there were grounds for the claim of discrimination") (citations omitted).

[12] Under this Court's Special Rule 29, a party may file a motion for attorney's fees on appeal "pursuant to contract, statute or otherwise." Qualls filed a motion for attorney's fees on appeal, which we took with the case. Qualls brought the underlying cause of action pursuant to the MHRA. The MHRA authorizes the court to "award court costs and reasonable attorney fees to the prevailing party . . . ." § 213.111.2. "This includes fees incurred on appeal from the trial court's judgment." *Soto v. Costco Wholesale Corp.*, 502 S.W.3d 38, 58 (Mo. App. W.D. 2016). Here, because we are affirming the judgment in favor of Qualls, Qualls is the prevailing party. Therefore, his motion for costs and attorney's fees on appeal is granted. "Although appellate courts have authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Id*. (internal quotation marks omitted). Accordingly, we remand the cause to the trial court for the purpose of conducting a hearing to determine the reasonableness of the costs and fees requested and to enter an appropriate award.